# Exhibit 3

a

# In The Matter Of:

*Anderson v Kencrest Services*

*Dekeshia Anderson*

*December 3, 2013*

*FrontinoReporting, LLC*
*34 North Front Street*
*Philadelphia, Pennsylvania 19106*
*215 922-2133   215 922-2910 fax*
*www.frontinoreporting.com*

Min-U-Script® with Word Index

Page 1

```
 1            IN THE UNITED STATES DISTRICT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3   DEKESHIA ANDERSON     :
          Plaintiff       :
 4                        :
        vs.               :
 5                        : CIVIL ACTION
     KENCREST SERVICES     :
 6      Defendant         : NO. 13-3716
 7            - - -
 8
             Bensalem, Pennsylvania
 9             December 3, 2013
10            - - -
11
12       Deposition of DEKESHIA ANDERSON,
13   held at the offices of Karpf, Karpf & Cerutti,
14   P.C., on the above date at 10:00 a.m., before
15   Jackelyn A. Johnston, a Certified Professional
16   Reporter and Notary Public.
17
18
19
20
21            FrontinoReporting, LLC
22   Frontino/DeFilippis Court Reporting Agency
              34 North Front Street
23        Philadelphia, Pennsylvania 19106
                (215) 922-2133
24            www.frontinoreporting.com
25
```

Page 2

```
 1  APPEARANCES:
 2
 3   KARPF, KARPF & CERUTTI, P.C.
     BY:  ZACHARY J. ZAHNER, ESQUIRE
 4   3331 Street Road
     Two Greenwood Square, Suite 128
 5   Bensalem, Pennsylvania  19020
     (215) 639-0801
 6   zzahner@karpf-law.com
     Attorneys for the Plaintiff
 7
 8   SALMON, RICCHEZZA, SINGER & TURCHI, LLP
     BY:  JOSEPH L. TURCHI, ESQUIRE
 9   1601 Market Street, Suite 2500
     Philadelphia, Pennsylvania  19103
10   (215) 606-6600
     jturchi@srstlaw.com
11   Attorneys for the Defendant
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2                    - - -
 3
 4   EXHIBIT      DESCRIPTION              PAGE
 5   D-1          4/11/12 Disciplinary      69
                  Action
 6
     D-2          Job Description           88
 7
     D-3          5/4/10 Supervisory        99
 8                Contact Sheet
 9   D-4          9/12/10 Supervisory      100
                  Contact Sheet
10
     D-5          2/2/11 Evaluation        104
11                Form
12   D-6          2/28/11 Supervisory      110
                  Contact Sheet
13
     D-7          4/7/11 Evaluation        113
14                Form
15   D-8          5/23/11 Letter from      117
                  Valerie Van Kirk
16
     D-9          7/20/11 Letter from      123
17                Valerie Van Kirk
18   D-10         7/21/11 E-Mail from      140
                  Valerie Van Kirk
19
     D-11         7/27/11 Letter to        148
20                Human Resources
21   D-12         9/23/11 Letter from      157
                  Denise Lamlin
22
     D-13         9/23/11 Letter          159
23
     D-14         10/31/11 Memorandum     165
24
     D-15         Document                166
25
```

Page 4

```
 1  INDEX (Cont'd.):
 2
 3   EXHIBIT      DESCRIPTION              PAGE
 4   D-16         3/20/12 to 3/26/12       181
                  E-Mail Chain
 5
     D-17         4/11/12 Disciplinary     184
 6                Action
 7   D-18         4/20/12 Letter to        192
                  Human Resources
 8
     D-19         4/30/12 Letter from      196
 9                Maggie Bolin
10   D-20         5/2/12 E-Mail Chain      200
11   D-21         5/2/12 E-Mail Chain      202
12   D-22         5/7/12 Letter from       204
                  Denise Lamlin
13
     D-23         5/2/12 E-Mail Chain,     207
14                5/23/12 & 5/24/12
                  E-Mails
15
     D-24         5/24/12 Letter from      208
16                Denise Lamlin
17   D-25         6/1/12 Letter from       211
                  Denise Lamlin
18
     D-26         11/19/12 Supervisory     213
19                Contact Sheet
20   D-27         12/22/12 Disciplinary    216
                  Action
21
     D-28         Letter to Stephanie      219
22                Righter
23   D-29         Supervisory Satisfaction 222
                  Questionnaire
24
     D-30         3/4/12 E-Mail Chain      226
25
```

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

---

Page 5

1  INDEX (Cont'd.):
2
3  EXHIBIT      DESCRIPTION         PAGE
4  D-31      3/4/12 Letter from      228
          Lucille Bernardo-Kaiser
5
6      (FIRST AMENDED CIVIL ACTION COMPLAINT &
   PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET
7  OF INTERROGATORIES ATTACHED HERETO.)
8
9
10
11
12
13  QUESTIONING BY: PAGE
14    MR. TURCHI          6
15    MR. ZAHNER        230
16
17
18
19
20
21
22
23
24
25

---

Page 6

D. Anderson

2    (It is stipulated by and between
3  counsel for the respective parties that
4  reading, signing, sealing, filing and
5  certification are waived and that all
6  objections, except as to the form of the
7  question, are reserved until the time of
8  trial.)
9        - - -
10      DEKESHIA ANDERSON, after having
11  been first duly sworn, was examined and
12  testified as follows:
13        - - -
14      EXAMINATION
15
16  BY MR. TURCHI:
17    Q.   Good morning, Ms. Anderson.  I
18  introduced myself a short time ago.  My name
19  is Joe Turchi.  I represent KenCrest.
20    A.   Good morning.
21    Q.   You understand you're here for a
22  deposition today?
23    A.   Yes.
24    Q.   Have you ever given a deposition
25  before?

---

Page 7

D. Anderson

2    A.   I don't think so.
3    Q.   Let me just give you a short set
4  of ground rules.
5        Obviously, your testimony
6  is being taken down today, so you have to give
7  verbal responses.  You can't shake your head
8  yes or no or anything like that.  Okay?
9    A.   Okay.
10    Q.   We need to do our best at not
11  talking over each other.  Try and wait until
12  I'm done my question and I'll try and wait
13  until you're done your answer before I ask
14  another question.  Fair enough?
15    A.   Yes.
16    Q.   If there's anything that I ask
17  you that you don't understand, by all means
18  let me know that.  And I'll try and rephrase
19  the question so that you do understand it.
20    A.   Okay.
21    Q.   You heard the court reporter say
22  something about usual stipulations.  This is a
23  case in Federal Court.  But what that means is
24  you know you need to respond to all of my
25  questions today, unless, of course, your

---

Page 8

D. Anderson

2  counsel says don't respond, which he's not
3  likely to do very often.  Do you understand
4  that?
5    A.   Yes, sir.
6    Q.   So give me a response.  If you
7  want to follow up with an explanation to your
8  response, that's up to you, as well.  Okay?
9    A.   Okay.
10    Q.   Is there any reason that you
11  know of that you would not be able to
12  understand and respond to my questions today?
13  And by that I mean, any medical condition, any
14  drugs that you might be taking or anything
15  like that that could impair your ability to do
16  so?
17    A.   No.
18    Q.   And, finally, as I said, you're
19  at a deposition.  Do you understand that
20  you've given an oath and this is the same
21  testimony that you'd be giving under oath just
22  as if you were in a courtroom?
23    A.   Yes.
24    Q.   Now, I'm going to show you a
25  series of documents today, as well as ask you

---

Anderson v Kencrest Services

Page 9

D. Anderson
1
2  questions. Take your time to look at the
3  documents before you respond to any questions
4  I might have about that. Okay?
5      A.   Yes.
6      Q.   You started this case by filing
7  what's called a complaint. Do you understand
8  that?
9      A.   Yes.
10     Q.   All right. I'm going to show
11 you a copy of your complaint. We're not going
12 to mark this as an exhibit, because it's a
13 pleading. Actually, it's called the first
14 amended complaint. I want you to just take a
15 quick look through that. I'm going to have
16 some questions for you specifically on some of
17 the provisions. But, you know, right now I'd
18 like you to tell me, if you can, is this a
19 document that you remember reviewing before it
20 was filed on your behalf?
21     A.   Yes.
22     Q.   Do you understand that this
23 complaint sets forth, among other things,
24 factual allegations that you are making
25 against KenCrest?

Page 10

D. Anderson
1
2      A.   Yes.
3      Q.   So to start, go to page three of
4  the complaint. It's in the section called
5  factual background. Are you with me?
6      A.   Yes.
7      Q.   And paragraph -- the numbered
8  paragraphs, number 12, says that Plaintiff --
9  that's you, do you understand that?
10     A.   Yes.
11     Q.   -- was promoted in or about July
12 of 2010 to the position of community home
13 supervisor at the 5500 Henry Avenue location,
14 among other things.
15        Am I correct that in July
16 of 2010 you were actually put in the position
17 of acting community home supervisor?
18     A.   Yes.
19     Q.   And you understood that at that
20 time it wasn't a permanent position yet?
21     A.   Yes.
22     Q.   Is it also correct that it was
23 KenCrest's policy that whenever someone was
24 promoted, they served another probationary
25 period?

Page 11

D. Anderson
1
2      A.   No, I was not aware of that.
3      Q.   When you were hired or any time
4  thereafter, did you receive a copy of the
5  KenCrest employee handbook or personnel
6  policies?
7      A.   Yes.
8      Q.   Did you take the opportunity to
9  read through those?
10     A.   Yes.
11     Q.   Do you remember signing off on
12 getting a copy of that?
13     A.   Yes.
14     Q.   All right. And it's not your
15 understanding that all promotions come with a
16 probationary period?
17     A.   No, I wasn't clear on that.
18     Q.   Who was the supervisor that told
19 you that you were promoted to acting community
20 home supervisor?
21     A.   I believe that was Vicky
22 Anderson.
23     Q.   And for how long was Vicky
24 Anderson your supervisor at the time that you
25 received this promotion to acting CHS in or

Page 12

D. Anderson
1
2  about July of 2010?
3      A.   Up until, I believe, January of
4  2012.
5      Q.   Okay. That's after. But how
6  about beforehand, was Vicky your supervisor
7  before then?
8      A.   Yes.
9      Q.   What was Vicky's position at the
10 time that she served as your supervisor?
11 Before you were promoted I'm talking about.
12     A.   She was the ADON assistant
13 project director. My immediate supervisor
14 from myself -- my next supervisor was
15 Dominique Lee. And Dominique Lee -- Vicky
16 Anderson was Dominique Lee's PD, but she was
17 over all of us.
18     Q.   PD means project director?
19     A.   Yes.
20     Q.   Now, before you became acting
21 CHS, you were what's called an RA; correct?
22     A.   Yes.
23     Q.   And what were, generally, your
24 duties as an RA?
25     A.   Generally, we took care of the



Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 13

D. Anderson

1  guys.  We made sure they was bathed, fed, took
2  them to school.  On some occasions we took
3  them to doctors' appointments.
4  Q.   Was it Dominique Lee who was
5  your direct supervisor when you were an RA?
6  A.   Yes.
7  Q.   How long did you work as an RA
8  before you became acting CHS?
9  A.   From December 2007 I was an RA
10 with KenCrest.
11 Q.   All right.  So December 2007
12 until about July of 2010?
13 A.   Yes.
14 Q.   Was Ms. Lee your supervisor
15 during all that period of time?
16 A.   No.
17 Q.   Who else was?
18 A.   We had -- it was a lot -- they
19 changed over a lot.  But we was with children,
20 the children division, so the main supervisor
21 I cannot remember the name.
22 Q.   While you were an RA, your
23 direct supervisor would have been the CHS of
24 the house; right?

Page 14

D. Anderson

1  A.   Yes.
2  Q.   Did you always work at 5500
3  Henry Avenue?
4  A.   Yes.  There was two sites.  I
5  always worked at 5500 Henry Avenue and I
6  also -- they sometimes sent me to Green Lane,
7  but the two houses was like sister and
8  brother.
9  Q.   Did the two houses have the same
10 CHS?
11 A.   Yes.
12 Q.   So Ms. Lee was the CHS for a
13 period of time?
14 A.   Yes.
15 Q.   Do you remember what period of
16 time that was?
17 A.   No, sir.
18 Q.   And who else besides Ms. Lee
19 served as CHS while you were an RA?
20 A.   I believe his name was Sam.  I
21 cannot remember his last name.
22 Q.   And you would have served under
23 either of those two CHS supervisors for about
24 two and a half years or so, that's how long

Page 15

D. Anderson

1  you were an RA; correct?
2  A.   Um.
3  Q.   December '07 to July of 2010?
4  A.   Yes.
5  Q.   At any time during that period,
6  while you served as an RA, did you ever
7  receive any discipline of any form by either
8  of your supervisors?
9  A.   Yes.
10 Q.   How many times?
11 A.   Once.
12 Q.   And what was that for?
13 A.   Unprofessional verbal
14 disagreement with another staff member.
15 Q.   And who gave you that
16 discipline?
17 A.   Dominique Lee.
18 Q.   And did Ms. Lee talk to you
19 about that discipline?
20 A.   Yes.
21 Q.   Did she also give you anything
22 in writing about that discipline?
23 A.   Yes.
24 Q.   And did you understand that it

Page 16

D. Anderson

1  was KenCrest's policy to give either verbal
2  warnings or written warnings or both for
3  matters of discipline?
4  A.   Could you repeat that?
5  Q.   Sure.  Did you understand, at
6  the time that you received the discipline from
7  Ms. Lee, both verbally when she spoke with you
8  and in writing when she gave you a written
9  warning, that that was KenCrest's policy that
10 she was following?
11 A.   Dominique never gave me a
12 written warning.  She gave me a supervisory
13 contact.
14 Q.   And that was in writing?
15 A.   Yes.
16 Q.   And was that follow-up to her
17 telling you verbally that in her view you
18 performed inadequately?
19 A.   It wasn't a follow-up.  It all
20 happened at the same --
21 Q.   Same time?
22 A.   Yes.
23 Q.   But you did get both, verbally
24 and she gave you something in writing, which

Page 17

```
 1                D. Anderson
 2   was the supervisory contact?
 3       A.   Yes, at the same time.
 4       Q.   And you said that that's the
 5   only time that you ever were disciplined in
 6   any way while you served as an RA?
 7       A.   As far as from my recollection,
 8   yes.
 9       Q.   And can you tell me what the
10   substance of the warning was?  What did Ms.
11   Lee say you did wrong?
12       A.   Ms. Lee said, when I came in,
13   one of the other staff members complained
14   about the way I was speaking to them.  There
15   was a pile of clothes left, and I asked them
16   what is that doing upstairs.  And she didn't
17   like my tone, so she reported it to Dominique.
18       Q.   Anything else that you remember
19   about that incident?
20       A.   No, that was it.
21       Q.   At the time that you -- during
22   the time that you worked as an RA, did you
23   take any medical leaves?
24       A.   As an RA?  I don't remember.
25       Q.   During the time that you worked
```

Page 18

```
 1                D. Anderson
 2   as an RA did you take any workers'
 3   compensation leaves?
 4       A.   I don't think so.
 5       Q.   Okay.  I just don't remember,
 6   did you say was it Ms. Lee or Vicky Anderson
 7   who told you they were making you acting CHS?
 8       A.   Vicky Anderson.
 9       Q.   Did you have to interview for
10   that position?
11       A.   Yes.
12       Q.   And who did you interview with?
13       A.   Vicky Anderson.
14       Q.   Anybody else?
15       A.   Deborah Rowell.
16       Q.   Deborah Rowell is -- well,
17   what's her position as far as you know?
18       A.   I believe she's the PD.
19       Q.   Project director?
20       A.   Yes.
21       Q.   So she would have been, at that
22   time, Vicky Anderson's boss?
23       A.   Yes.
24       Q.   Any other interviews?  Just the
25   two of them?
```

Page 19

```
 1                D. Anderson
 2       A.   They were in the same interview.
 3   When I interviewed for the position, they
 4   didn't hire me then.  They didn't hire me for
 5   the position until problems started occurring
 6   at the site.
 7       Q.   Did they hire someone else for
 8   the position when you were first interviewed?
 9       A.   Dominique Lee.
10       Q.   I'm not following that.  I
11   thought Dominique Lee was already the CHS?
12       A.   She was not.
13       Q.   She was not?  What was her
14   position beforehand?
15       A.   I think she was an RA with
16   KenCrest.
17       Q.   But how about the time that she
18   gave you a supervisor's contact?
19       A.   When she gave me the supervisor
20   contact, she was the supervisor at the house.
21   She was a CHS or acting -- I'm not sure if she
22   was -- she was my supervisor at that time.
23       Q.   All right.  Do you have any
24   information as to whether Dominique Lee
25   interviewed for the CHS job at or around the
```

Page 20

```
 1                D. Anderson
 2   same time that you were interviewing for it?
 3       A.   I have no information on that.
 4       Q.   Did anyone ever tell you whether
 5   -- strike that.
 6            Okay.  All right.  Go back
 7   to your amended complaint.  Look at paragraph
 8   number 13.  It says in or about December of
 9   2010 you sustained work-related injuries from
10   an altercation with a client.
11            Did I read that correctly?
12   Do you remember that?
13       A.   Yes.
14       Q.   Now, did you take medical leave
15   as a result of those injuries?
16       A.   Yes.
17       Q.   What was your position at the
18   time?
19       A.   Acting community supervisor.
20       Q.   So at that time you were still
21   acting CHS; correct?
22       A.   Yes.
23       Q.   And who was your supervisor at
24   that time in or about December of 2010 when
25   you were injured?
```

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

---

Page 21

1              D. Anderson
2       A.   Vicky Anderson.
3       Q.   Vicky Anderson was still your
4  supervisor?
5       A.   Yes.
6       Q.   Okay.  The leave that you took,
7  was it workers' comp, FMLA, or both?  What do
8  you know?
9       A.   I think it was workmen comp
10  leave. I'm not sure if it was family.  I
11  don't know if it fell under the same thing.
12       Q.   Are you aware of whether
13  KenCrest has a policy that when you're out on
14  leave of any type, medical leave, they run
15  concurrently?  Do you know what I mean by
16  that?
17       A.   No, sir.
18       Q.   Did anyone ever tell you when
19  you were out on a workers' comp leave that it
20  was also deemed to be FMLA leave?
21       A.   I'm not sure.
22       Q.   In paragraph 14, you said that,
23  prior to December of 2010, you had performed
24  your job well, received praise, and did not
25  have any disciplinary concerns.

---

Page 22

1              D. Anderson
2       Did I read that right?
3       A.   Yes.
4       Q.   Who, if anyone, told you --
5  well, let me back up.
6       In that paragraph, are you
7  referring to the job you were performing at
8  that time as acting CHS, or are you referring
9  back to when you were an RA, or both?
10       A.   When I was acting CHS.
11       Q.   Who, if anyone, had told you
12  between the time that you became acting CHS --
13  that was in July of 2010, up until December of
14  2010 -- who told you that you were performing
15  your job well?
16       A.   Vicky Anderson.
17       Q.   Anyone else?
18       A.   Pat Martin.
19       Q.   Who is Pat Martin?
20       A.   She's the nurse, the nurse.  She
21  oversees the medical aspects of the center.
22       Q.   All right.  And she -- at the
23  time, was she a supervisor of yours?
24       A.   I believe she was our supervisor
25  over the nursing department.

---

Page 23

1              D. Anderson
2       Q.   But I'm talking about was she
3  your supervisor?
4       A.   Yes, sir.  I had to answer to
5  her with just about anything medical.
6       Q.   All right.  As of this time,
7  which is December of 2010, had you received
8  any performance evaluation from Vicky Anderson
9  or anyone else at KenCrest in your role as
10  acting CHS?
11       A.   No, sir, I don't think so.
12       Q.   Okay.  You say in that paragraph
13  also that you received praise.  Who did you
14  receive praise from?
15       A.   Vicky Anderson and Pat Martin.
16       Q.   And you said you did not have
17  any disciplinary concerns.  Did Ms. Anderson
18  or anyone else, from the period of time you
19  became acting CHS till this time you were
20  injured in 2010, ever talk to you about
21  anything that they thought you could be doing
22  better?
23       A.   No, sir.  I just went through
24  training.
25       Q.   Who was training you?  Vicky

---

Page 24

1              D. Anderson
2  Anderson?
3       A.   Yes.
4       Q.   So sitting here today, you don't
5  remember any time -- I know this is a couple
6  years ago.  So if you don't remember, you just
7  need to tell me that.  But you don't remember
8  any period of time when either Ms. Anderson or
9  anyone else sat down with you, from the time
10  you became acting CHS till December of 2010,
11  and said anything like, Ms. Anderson, you need
12  to do this a little better or you need to pay
13  attention to that, or as part of your job as a
14  CHS you need to improve on such-and-such?  You
15  don't remember any conversation like that?
16       A.   No, sir.  I don't remember that.
17       Q.   Now, you came back from this
18  injury you sustained in or around January of
19  2011; is that right?
20       A.   Yes.
21       Q.   So, as you understand, you were
22  out several weeks?
23       A.   Yes.
24       Q.   When you came back in January of
25  2011, who was your supervisor?

---

Page 25

D. Anderson

1          D. Anderson
2      A.   Vicky Anderson for maybe about a
3  week or two, around about.  I'm not sure of
4  time frame.  And then they transferred me over
5  to Valerie Van Kirk.
6      Q.   Transferred you over to her or
7  she just became the --
8      A.   Yeah, took over --
9      Q.   That area?
10     A.   Yeah.
11     Q.   Clearly, when you came back from
12 your leave, whatever period of time you needed
13 to be out, KenCrest put you back in the same
14 position; right?
15     A.   Yes.
16     Q.   You were still acting community
17 home supervisor?
18     A.   Yes, I believe so.
19     Q.   And then there was some period
20 of time -- strike that.
21          There came a time when
22 KenCrest actually made you community home
23 supervisor for that home; correct?
24     A.   Yes.
25     Q.   When was that?

Page 26

1          D. Anderson
2      A.   I believe that was in July --
3  I'm not sure.  I'm not sure of the date.
4      Q.   Do you have any recollection of
5  about how long after you took your medical
6  leave in December of 2010 and came back in
7  January of 2011, about how long after that you
8  became the full-fledged community home
9  supervisor?
10     A.   I'm not sure of the date.
11     Q.   Can you put it -- I'm not asking
12 you for a date.  Can you put any time frame of
13 reference on it at all?  Was it a month after
14 you came back?  Two months?  Three months?
15 Five months?
16     A.   I don't remember.
17     Q.   Okay.  Did you understand that
18 there was a decision that was made by someone
19 or some people at KenCrest after you came back
20 from your medical leave that was made to make
21 you from acting community home supervisor to
22 the full-fledged community supervisor?
23     A.   Yes.
24     Q.   Do you have any understanding of
25 who participated in that position?

Page 27

1          D. Anderson
2      A.   I believe -- I believe it was
3  Vicky Anderson and Deborah Rowell.
4      Q.   Do you have any understanding of
5  whether Valerie Van Kirk participated in that
6  decision?
7      A.   I don't think so.
8      Q.   What leads you to believe that?
9      A.   She wasn't my supervisor at the
10 time.
11     Q.   All right.  Well, let me try and
12 refresh your memory, because you told me you
13 don't remember the time.  You came back from
14 leave sometime in January of 2011; right?
15     A.   Yes.
16     Q.   You had been out for just a few
17 weeks?  Yes?
18     A.   Yes.
19     Q.   You're doing a good job with
20 that.  Just don't fall into that trap.  We all
21 do.
22          And then I think you told
23 me that Ms. Anderson was only your supervisor
24 for, like, another week after you came back?
25     A.   Yes.

Page 28

1          D. Anderson
2      Q.   Correct?
3      A.   Yes.
4      Q.   So was it your recollection that
5  you were made a full CHS during that week
6  period of time from when you came back and
7  when your supervisor changed from Ms. Anderson
8  to Ms. Van Kirk?  Do you understand what I'm
9  asking you?
10     A.   I believe I understand your
11 question.  I just cannot answer it because I'm
12 not sure of the time and date when I became
13 from acting to community supervisor.
14     Q.   So would it be correct then that
15 you don't know whether Valerie Van Kirk
16 participated in the decision to change you
17 from acting CHS to full CHS?  You just don't
18 know?
19     A.   I just don't know.
20     Q.   Okay.  There was a time -- after
21 you came back in January of 2011 from your
22 first medical leave, there was a period of
23 time that you worked as either acting CHS or
24 CHS or both before you went out on a second
25 medical leave; correct?

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 29

D. Anderson
1
2      A.   Yes.
3      Q.   During that period of time --
4  well, let me back up.  Do you remember when
5  you took your second medical leave?
6      A.   I think it was around July.
7      Q.   Of 2011?
8      A.   Yes.
9      Q.   So there would have been about
10 six months or so in between when you came back
11 from your first leave and when you went out on
12 your second leave?
13     A.   I think so.
14     Q.   And for most of that period of
15 time, Valerie Van Kirk was your supervisor;
16 correct?
17     A.   Yes.
18     Q.   During that period of time,
19 again, from when you came back from your first
20 leave and before you went out on your second
21 leave, did you receive any discipline from Ms.
22 Van Kirk or anybody else?
23     A.   I believe so.  I'm not sure on
24 the times disciplinaries started, but I think
25 so.

Page 30

D. Anderson
1
2      Q.   Okay.  And what do you remember
3  about receiving discipline?  Again, I'm only
4  talking about that period of time between your
5  first leave and when you went out on your
6  second leave.  Do you remember receiving
7  verbal discipline, written discipline, both?
8      A.   I remember receiving, I think it
9  was the supervisory contact.
10     Q.   What was the basis of the
11 supervisory contact?  Do you remember?
12     A.   It was unprofessional manners.
13     Q.   Is that similar to the same one
14 you had received from a different manager when
15 you were an RA?
16     A.   Yes.
17     Q.   Verbal-type abuse?
18     A.   Yes.
19     Q.   Anything else that you remember
20 receiving in the way of discipline, either
21 written or verbal --
22     A.   No.
23     Q.   -- during that period of time
24 I'm talking about?
25     A.   No, sir.  I don't remember.

Page 31

D. Anderson
1
2      Q.   During that period of time --
3  and again, I'm focusing on about a six-month
4  period between January of 2011 and July of
5  2011.  Valerie Van Kirk is your supervisor.
6  Did you receive any written performance
7  evaluations, if you remember?
8      A.   Yes, I did.
9      Q.   Did you receive one or more than
10 one?
11     A.   I'm not sure how many.
12     Q.   Do you know whether that
13 performance evaluation was completed by Ms.
14 Anderson, Ms. Van Kirk?
15     A.   Ms. Van Kirk.
16     Q.   Was it KenCrest's policy to go
17 over performance evaluations with you at the
18 time?
19     A.   Yes, sir.
20     Q.   So Ms. Van Kirk went over the
21 performance evaluation with you?
22     A.   Yes, sir.
23     Q.   Did she talk to you about the
24 ratings that she gave you?
25     A.   Yes, sir.

Page 32

D. Anderson
1
2      Q.   Did she tell you that there
3  were, in her view, things that you needed to
4  improve on?
5      A.   Yes, sir.
6      Q.   Did she also tell you there were
7  things, in her view, you did well?
8      A.   Yes, sir.
9      Q.   Did you think the evaluation was
10 a fair evaluation?
11     A.   I'm not sure.  I can't recall
12 the evaluation.
13     Q.   We'll look at that later.  Right
14 now I'm just asking you what you know from
15 your memory.  And if you don't remember,
16 again, it's perfectly permissible to say you
17 don't remember.
18     A.   I don't remember.
19     Q.   Go to paragraph number 22 of
20 your amended complaint.  It's on page four.
21     A.   Twenty-two?
22     Q.   Yes.  In that paragraph, you
23 said, while discussing her health problems and
24 potential leave needs, Plaintiff was
25 experiencing very significant animosity from

Anderson v Kencrest Services

Page 33

D. Anderson

1   D. Anderson
2   her management about her health problems and
3   had received pretextual discipline in
4   mid-2011, the first discipline she was given
5   in roughly four years of working for
6   Defendant.
7   Did I read that right?
8       A.   Yes.
9       Q.   Well, the last part of that
10  paragraph is not correct; right?  You said
11  that it was the first discipline you received,
12  but we've already pointed out that you
13  received discipline before that; correct?
14      A.   Let me clarify.  When I was
15  speaking of disciplinary action, that was the
16  first time she gave me something written.
17  Other things was -- from what I understood and
18  what was explained to me at KenCrest was
19  supervisory contacts are meetings.  They're
20  not disciplinary actions.
21      Q.   Who told you that?
22      A.   Valerie Van Kirk.
23      Q.   So what you're saying here is
24  this was the first time you actually received
25  a written warning?

Page 34

1   D. Anderson
2       A.   Yes, sir.
3       Q.   Now you're saying you were
4   receiving very significant animosity from your
5   management about health problems?
6       A.   Yes, sir.
7       Q.   Who are you referring to there?
8       A.   Valerie Van Kirk.
9       Q.   Anybody else?
10      A.   No, sir.
11      Q.   And what was the form of the
12  animosity that you received from Valerie?
13      A.   I don't know what you mean by
14  the form.
15      Q.   In other words, did she say
16  things to you?
17      A.   Yes.
18      Q.   Did she act differently with
19  you?
20      A.   Yes.
21      Q.   What do you mean by you
22  experienced very significant animosity from
23  her?
24      A.   When we would discuss the client
25  that attacked me, she would say nothing

Page 35

1   D. Anderson
2   happened to you, he didn't do that to you and
3   you're not hurt.  Things like that.
4       Q.   The client that attacked you,
5   you're talking about back in December of 2010?
6       A.   Yes.
7       Q.   All right.  What caused you to
8   discuss -- and back at that time, she wasn't
9   your supervisor, correct, when the client
10  attacked you?
11      A.   No, she was not.
12      Q.   So what caused you to discuss
13  that attack with Valerie Van Kirk at some
14  later date?
15      A.   It probably was the behaviors of
16  the client.  The client had behaviors,
17  outbursts and things like that.  So I would
18  say things like, well, when he attacked me,
19  she would start, he didn't do nothing to you.
20  Things like that.
21      Q.   Were these meetings that you
22  were having with Valerie Van Kirk when these
23  things were said?
24      A.   I don't know if you can consider
25  them meetings, but it was plenty times where

Page 36

1   D. Anderson
2   she would be over at the site, we're doing
3   paperwork -- like, the client had behaviors.
4   So any time he would have an outburst or
5   something, my job was to report it.  And I
6   guess she would have to come and do some kind
7   of report into the system.  And those were the
8   times where as though she would say negative
9   things about my condition.
10      Q.   Well, what did she say about
11  your condition?  What you told me was that she
12  said that the client didn't do anything to
13  you?
14      A.   Right.
15      Q.   What else did she --
16      A.   She would tell me I'm not hurt.
17  She would tell me stop lying when I'm speaking
18  of it.  Things like that.
19      Q.   Were these statements that she
20  made made to you without anybody else present?
21      A.   Yes.
22      Q.   Or were there other people
23  present?
24      A.   No one was there with us.
25      Q.   So as far as you can remember,

Dekeshia Anderson
December 3, 2013

Page 37

D. Anderson

1  was there any time where one of these
2  statements was made by Valerie where anybody
3  else was within earshot of it?
4  A.  No.
5  Q.  Okay.  Now, it is correct that
6  in her job, Valerie Van Kirk, she wasn't at
7  the home all the time; correct?
8  A.  No.
9  Q.  She supervised more than just
10  the Henry Avenue home that you were the CHS
11  for?
12  A.  Yes.
13  Q.  In paragraph 22, you go on to
14  say you had received pretextual discipline in
15  mid-2011.  What do you mean by that?
16  A.  She gave me a write-up.  I
17  believe she gave me a write-up.
18  Q.  And the write-up was the written
19  warning that you talked about before; correct?
20  A.  I'm not sure.
21  Q.  Well, do you have a memory of
22  getting more than one write-up from Valerie
23  Van Kirk?  Now, I'm talking about in the same
24  time frame you're referencing in your

Page 38

D. Anderson

1  complaint, which is mid-2011, before you went
2  out on your second leave.
3  A.  I'm not sure.
4  Q.  Well, look at paragraph 22.
5  What you're saying in paragraph 22 is that you
6  got this written pretextual discipline and it
7  was the first discipline you had received in
8  four years.  Does that refresh your memory
9  that there was only one written warning that
10  you were given before you went out on your
11  second leave?
12  A.  I don't know if it was before I
13  went out on my second leave.  I'm not sure of
14  the date of when I received it.
15  Q.  But the warning -- you testified
16  earlier, the warning you're talking about was
17  the one you were given for verbal abuse;
18  correct?  Is that the one you're referring to
19  here in paragraph 22?
20  A.  They were supervisory contacts,
21  so I don't --
22  Q.  Okay.  Well, whether it was --
23  don't get caught up in my phraseology, but it
24  was a written document?

Page 39

D. Anderson

1  A.  Yes.
2  Q.  Supervisory contact is a written
3  document; correct?
4  A.  Yes.
5  Q.  And the substance of the
6  document that you're talking about here was
7  for verbal abuse; correct?
8  A.  Yes.
9  Q.  And, again, I identified earlier
10  that you had received a similar-type
11  warning --
12  A.  RA.
13  Q.  -- or supervisory contact for
14  verbal abuse when you were an RA for a
15  different supervisor; correct?
16  A.  Yes.  Can I speak on that?
17  Q.  Sure.
18  A.  She used that -- what she told
19  me, she used that write-up that I got as an RA
20  for basis of the write-up that she gave me --
21  that she gave me for the same thing.
22  Q.  Did she tell you what she meant
23  by that?
24  A.  She used that -- she said -- she

Page 40

D. Anderson

1  referred back in my files to the other
2  write-up to get -- I guess to give her
3  leverage, I don't know, to write this one up,
4  because a staff complained about it.
5  Q.  All right.  Sometime in 2011,
6  before she gave you this supervisory contact
7  on verbal abuse, is it correct that one or
8  more of the staff people at the home that you
9  were the CHS for complained about verbal
10  abuse?
11  MR. ZAHNER: Objection to
12  form.
13  THE WITNESS: Could you
14  repeat that?
15  BY MR. TURCHI:
16  Q.  Sure.  When Valerie gave you
17  this supervisory contact in 2011, the one that
18  you're referring to here in paragraph 22 of
19  your complaint -- are we on the same page?
20  A.  Yes.
21  Q.  -- she told you it was because
22  other staff had complained about the way that
23  you spoke to them; correct?
24  A.  No.

Page 41

D. Anderson

1
2    Q.    She didn't tell you that?
3    A.    No.
4    Q.    What did she tell you?
5    A.    She told me that it was a
6    complaint from a staff member about the way I
7    was speaking to him as a supervisor.
8    Q.    Okay.  And I thought that's what
9    I asked you.
10        You understood, because she
11   told you, that somebody else who worked at the
12   Henry Avenue home complained about the way you
13   spoke to them; is that correct?
14   A.    Yes.
15   Q.    And then did she tell you in sum
16   or substance that she had seen that you had
17   received a similar-type warning when you were
18   an RA?
19   A.    Yes.
20   Q.    Is that what you were referring
21   to before when you said she said she went back
22   to the old one?
23   A.    Yes.
24   Q.    In paragraph 22, you said that
25   was pretextual discipline.  Is it your

Page 42

D. Anderson

1
2    position that Valerie made it up, that this
3    other staff member did not complain to her
4    about the way you spoke to them?
5    A.    I wouldn't say she made it up.
6    I would say she provoked it.
7    Q.    In which way?
8    A.    She would have meetings with the
9    staff.  And then she would come back to me to
10   have me redirect the staff.  And then she
11   would go and tell the staff, well, she
12   shouldn't do that.  So I believe she provoked
13   that.  The whole hostile work environment was
14   provoked by Valerie Van Kirk.  From the staff
15   that I had to supervise, she would go and feed
16   them negative things.  So where as though I
17   would have to go and redirect them, because
18   she tells me to redirect them, she's, on the
19   other hand, telling them that I shouldn't be
20   doing that.
21   Q.    Let me back up.  Is it your
22   position that Ms. Van Kirk, as your
23   supervisor, didn't have the right to meet with
24   the people who worked --
25   A.    I did not say that.

Page 43

D. Anderson

1
2    Q.    Well, let me finish.
3    A.    I'm sorry.
4    Q.    Is it your position that she
5    didn't have the right to meet with people who
6    were working under you at the Henry Avenue
7    home?
8    A.    No, that's not my position.
9    Q.    Do you have any knowledge or
10   information from any source that Ms. Van Kirk
11   did not also meet with people at the other
12   homes that she supervised?
13   A.    I have no knowledge of that.
14   Q.    When Ms. Van Kirk met with the
15   people who worked under you at the Henry
16   Avenue home, were you also present?
17   A.    No, sir.
18   Q.    All right.  After she met with
19   them, would she have a meeting with you?
20   A.    Yes, sir.
21   Q.    And at or around the time that
22   she gave you the written document, which
23   claimed that you committed verbal abuse
24   towards a staff member, did she tell you that,
25   at one of those meetings, at least one of the

Page 44

D. Anderson

1
2    staff members complained to her about the way
3    you spoke to them?
4    A.    Yes, sir.
5    Q.    Look at paragraph 24 of your
6    amended complaint.  In that you say Plaintiff
7    made a formal written complaint of
8    discrimination to Defendant's human resources
9    department on July 27, 2011, referencing she
10   had been discriminated against due to her
11   workers' compensation matter and health
12   conditions, among other concerns.
13        Did I read that right?
14   A.    Yes.
15   Q.    What are you referring to there
16   when you say among other concerns?
17   A.    The hostile working environment
18   that I was forced to work in.
19   Q.    Now, when you made the complaint
20   to human resources, you said that you were
21   being discriminated against and harassed;
22   correct?
23   A.    Yes, sir.
24   Q.    And did you say that you were
25   being discriminated against and harassed

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 45

1          D. Anderson
2 because of your health conditions?
3     A.   Yes, sir.
4     Q.   Did you say it was because of
5 your leaves of absence?
6     A.   No, sir.
7     Q.   Did you say it was because of
8 being on workers' compensation?
9     A.   No, sir.
10     Q.   Did you say that it was because
11 of your race?
12     A.   No, sir.
13     Q.   Did you say that it was because
14 of your gender?
15     A.   No, sir.
16     Q.   All right. So am I correct that
17 the basis of your complaint to human resources
18 that you reference here around July 27th of
19 2011 was discrimination and/or harassment
20 based on your health condition?
21     A.   Yes, sir.
22     Q.   Nothing else?
23     A.   Among other concerns.
24     Q.   Well, what's the other concerns?
25 That's what I'm asking you.

Page 46

1          D. Anderson
2     A.   The hostile way I was treated.
3     Q.   But what were you claiming was
4 hostile? Were you claiming you were being
5 treated in a hostile manner because of your
6 health condition or something else?
7     A.   Well, I don't know why I was
8 treated that way. I'm not sure. I just had
9 to endure it.
10     Q.   Okay. But we're clear that it
11 wasn't -- you were not making a complaint that
12 you were being mistreated because of your race
13 or your gender or your age or your religion or
14 anything like that; correct?
15     A.   No, just my disability.
16     Q.   Go to the next page. I'm
17 looking at paragraph 26 of your complaint.
18 You say, during the second half of 2011 and
19 early 2012, Van Kirk was also continually
20 raising false or feigned concerns about
21 Plaintiff's conduct in the workplace through
22 questions that implied she was looking for any
23 reason to discipline Plaintiff.
24         Did I read that correctly?
25     A.   Yes, you did.

Page 47

1          D. Anderson
2     Q.   What did Valerie Van Kirk raise
3 which was false or feigned about what you were
4 doing as a CHS at that time?
5     A.   My paperwork, the concerns that
6 I don't answer the e-mails, the behaviors that
7 I had with the staff members.
8     Q.   Anything else?
9     A.   Not that I can recall right now.
10     Q.   And is it your position, sitting
11 here today, that all of those concerns that
12 were raised by Valerie Van Kirk were false?
13     A.   Yes.
14     Q.   Okay. Look at paragraph 28.
15 You say, the ongoing mistreatment you were
16 experiencing since her work injury and medical
17 leaves, you memorialized a complaint to
18 Defendant's human resources management on
19 April 29, 2012.
20         Did I read that correctly?
21     A.   Yes.
22     Q.   Now, I'll go into what your
23 complaint says, but you went out on your
24 second medical leave sometime around July of
25 2011; right?

Page 48

1          D. Anderson
2     A.   Yes.
3     Q.   And for how long?
4     A.   I believe I came back in
5 September.
6     Q.   So a couple of months?
7     A.   Yes.
8     Q.   When you came back, was Valerie
9 Van Kirk still the supervisor of whoever was
10 the CHS at --
11     A.   Yes.
12     Q.   While you were out on leave, did
13 someone else serve as the CHS?
14     A.   I don't think so, no.
15     Q.   Did Ms. Van Kirk spend more time
16 at that home while you were out?
17     A.   I don't know.
18     Q.   All right. But in any event,
19 when you were ready to come back, you were
20 placed back into the same position as CHS at
21 Henry Avenue; correct?
22     A.   Yes.
23     Q.   And that was from September of
24 2011?
25     A.   Yes, sir.

Page 49

D. Anderson

1
2      Q.   Did you have any other medical
3  leaves after that while you were a CHS?
4      A.   No, sir.
5      Q.   So am I correct then from
6  September of 2011, when you were placed back
7  into the position of CHS, until April of 2012,
8  you didn't make any complaints to human
9  resources or anybody else about being
10  mistreated by Valerie Van Kirk or anybody
11  else?
12      A.   No, I made no -- no, no.
13      Q.   That is correct, you didn't make
14  any complaints?
15      A.   Correct.
16      Q.   So now you make a complaint in
17  the end of April of 2012; correct?
18      A.   Yes.
19      Q.   And you say in that complaint
20  among other things -- and I'm only reading the
21  part of it that's in your complaint here,
22  that's in the lawsuit.  On July 27th, you
23  filed a claim of discrimination and
24  harassment.  As of this date, I am still being
25  harassed and discriminated against, which is

Page 50

D. Anderson

1
2  giving me a uncomfortable feeling at work.
3          Did I read that correctly?
4      A.   Yes.
5      Q.   Let me talk to you about the
6  earlier complaint that you filed, July 27,
7  2011.  Do you remember that?
8      A.   Yes.
9      Q.   Sometime after you filed the
10  complaint, did you have a meeting with human
11  resources?
12      A.   Yes, sir.
13      Q.   Was that Denise Lamlin?
14      A.   Yes.
15      Q.   Anybody else in that meeting?
16      A.   I believe Valerie Van Kirk and
17  Deborah Rowell was there.
18      Q.   Do you have any information or
19  understanding about what KenCrest human
20  resources did once they received your
21  complaint and before they met with you?
22          MR. ZAHNER: Objection to
23  the form.
24          THE WITNESS: No, sir.
25  BY MR. TURCHI:

Page 51

D. Anderson

1
2      Q.   Do you have any knowledge
3  whether your complaint was investigated by
4  KenCrest human resources?
5      A.   No, sir.
6      Q.   You don't know one way or the
7  other?
8      A.   I don't know one way or the
9  other.
10      Q.   When you met with Denise Lamlin
11  and Valerie Van Kirk and Deborah Rowell, were
12  you told by Denise Lamlin or anyone else that
13  they investigated your complaint?
14      A.   I don't recall.
15      Q.   Okay.  Were you told -- well,
16  what do you remember about that meeting?  What
17  were you told?
18      A.   I was told that upon my return
19  back to work, they're going to set me up with
20  monitor and other training --
21      Q.   You mean a mentor?
22      A.   Yeah, a mentor and other
23  trainings.
24      Q.   When you had the meeting with
25  Denise Lamlin, were you already out on leave?

Page 52

D. Anderson

1
2      A.   Yes.  I hadn't returned back to
3  work yet.
4      Q.   All right.  So you made your
5  complaint on July 27, 2011.  Were you on leave
6  already when you made the complaint or did you
7  go out thereafter?
8      A.   I'm not sure.
9      Q.   And isn't it correct that you
10  asked for a mentor?
11      A.   No, I don't think so.
12      Q.   Anything else you remember about
13  your first complaint of harassment --
14      A.   I'm sorry?
15      Q.   Anything else that you remember
16  about the first complaint you made of
17  harassment/discrimination and what came of it?
18  By that I mean, anything else that you
19  remember that Denise Lamlin or anyone else
20  told you in that meeting about your complaint
21  about what they were doing about it?
22      A.   No.
23      Q.   Okay.  So here we are in April
24  of 2012, and it's, again, a number of months
25  after you came back from your second leave

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

---

Page 53

D. Anderson

1
2     that you make this second complaint; correct?
3        A.   Yes.
4        Q.   And you told Denise Lamlin that
5     you were -- you had an uncomfortable feeling
6     at work; correct?
7        A.   Yes.
8        Q.   And is it correct that Denise
9     Lamlin told you don't go back to work there?
10       A.   Yes.
11       Q.   All right.  Isn't it correct
12    that she put you on paid administrative leave?
13       A.   Yes.
14       Q.   Did you understand that she was
15    investigating your complaint and that's why
16    she told you not to go back there?
17       A.   Yes, I believe so.
18       Q.   Look at paragraph 33, which is
19    page six of your complaint.  And this
20    paragraph says, among other things, on May 23,
21    2012 you e-mailed Lamlin explaining certain
22    things, and I'll go into those.
23             I want you to think back
24    around this time.  Is it correct that you were
25    put on administrative leave from when you made

---

Page 54

D. Anderson

1
2     your complaint in late April till about May
3     22nd of 2012?
4        A.   I'm not sure when I was placed
5     on administrative leave.  I'm not sure of the
6     date, but I believe it was in April.
7        Q.   You were placed on it in April?
8        A.   I believe so.
9        Q.   I'm saying when did you come
10    off?  Do you remember it being around on or
11    about May 22nd?
12       A.   Yes, I believe so.
13       Q.   And during that approximately
14    three-week period of time, you were being paid
15    by KenCrest; correct?
16       A.   Yes.
17       Q.   You can read this whole thing
18    but I'm pointing out just one of the sections
19    of the middle paragraph of paragraph 33.
20    You're telling Denise Lamlin in this e-mail,
21    instead it seems like you just terminated me.
22             Did anybody at KenCrest
23    ever tell you that you were terminated?
24       A.   No, they never told me I was
25    terminated.

---

Page 55

D. Anderson

1
2        Q.   Did you ever receive a letter or
3     anything in writing or e-mail or anything like
4     that that said you were terminated from
5     your position at KenCrest?
6        A.   No.
7        Q.   Further down in that paragraph
8     you say that you needed an income.  Were you
9     working anyplace else at that time?
10       A.   Yes, sir.
11       Q.   Were you working full time
12    someplace else or part time?
13       A.   It was part-time, temporary
14    work.
15       Q.   Where were you working?
16       A.   I was working at -- I believe it
17    was Staffing Plus.  They send you out to
18    different sites.
19       Q.   So you didn't have a permanent
20    position?
21       A.   No.
22       Q.   You went to different places?
23       A.   No, no.
24       Q.   During the time -- let me back
25    up.  You're a CHS for KenCrest up till, at

---

Page 56

D. Anderson

1
2     least, the end of April of 2012.  You're
3     working full time in that position; correct?
4        A.   Yes.
5        Q.   Is that a 40-hour week?
6        A.   Yes, but I always worked more.
7        Q.   You mean you always worked more
8     for KenCrest or for someplace else?
9        A.   For KenCrest.
10       Q.   At the same time you were
11    working as CHS, were you also working
12    someplace else?
13       A.   Yes.
14       Q.   So how long of a period of time
15    were you working through this temporary
16    staffing agency?  Was it all throughout your
17    KenCrest work?
18       A.   No.  I just started with them
19    when I was on the administrative leave, I
20    believe.
21       Q.   So that's when you started
22    working for this temporary --
23       A.   Yes, I started looking for work
24    then.
25       Q.   When you were on administrative

---

FrontinoReporting, LLC
www.frontinoreporting.com - 800 831-6637

Page 57

D. Anderson

1   leave, how many hours were you working on a
2   temporary basis for the staffing agency?
3      A.   Maybe -- I don't know.  Maybe
4   about five hours a day or something like that.
5   I'm not sure, but it wasn't a full-time
6   position.
7      Q.   Go to paragraph 36, please.
8   It's on page seven.  In this paragraph you say
9   you were demoted to an inferior job that was
10  non-supervisory, given a reduced hourly rate
11  at $6 less per hour than previously earned,
12  and required to drive a much more substantial
13  distance to work.
14         Did I read that correctly?
15     A.   Yes.
16     Q.   Now, I'm going to ask you a lot
17  more questions about that when we get to them,
18  but I'm going to ask you a couple questions
19  here.  When you were demoted from CHS back to
20  RA -- do you remember that?
21     A.   Yes.
22     Q.   -- isn't it correct that you
23  refused to take a job as an RA in the
24  Philadelphia region?

Page 58

D. Anderson

1      A.   No.
2      Q.   Isn't it correct that you said
3   you wanted to work in the other region, the
4   eastern?
5      A.   No.
6      Q.   You never told anybody that?
7      A.   I told her I would prefer
8   to go to the eastern -- not the eastern, a
9   different county.  I think it was Bucks
10  County.  I think it was the Bucks County.
11     Q.   And you never told anybody at
12  any interviews during that period of time when
13  KenCrest was searching for an RA position for
14  you that you didn't want to work in
15  Philadelphia?
16     A.   No.
17     Q.   Now, when you found -- when
18  KenCrest found an RA position that you were
19  willing to accept, you chose to take less than
20  40 hours a week; isn't that correct?
21     A.   No.
22     Q.   You wanted 40 hours a week and
23  they didn't give it to you?
24     A.   I just wanted full time.

Page 59

D. Anderson

1      Q.   Didn't you tell people you
2   interviewed with you couldn't work on Fridays
3   and you could only work --
4      A.   I never worked on Fridays.
5      Q.   Just follow me.
6      A.   All right.
7      Q.   When you were interviewing for
8   an RA position, isn't it correct that you told
9   the people you interviewed with you couldn't
10  work on Fridays, you only could work Saturday,
11  Sunday and one weekday?
12     A.   Yes.
13     Q.   So if you could only work
14  Saturday, Sunday and one weekday, it wasn't
15  going to be full time; correct?
16     A.   Wrong.
17     Q.   How did you expect to get full
18  time working weekends and one weekday?
19     A.   Because of the shifts that
20  KenCrest offers.  They offered 12-hour shifts
21  on weekends.
22     Q.   Okay.  So if that was two days,
23  that would be 24 hours; correct?  And then one
24  day during the week would be how many?

Page 60

D. Anderson

1   Another eight?
2      A.   It would be eight.
3      Q.   So that would be 32 hours,
4   instead of 40; correct?
5      A.   Yes.
6      Q.   You can put that aside for now.
7   What I'm showing you is a document called
8   Plaintiff's responses to Defendant's first set
9   of interrogatories.  Are you familiar with
10  this document?
11     A.   Yes, sir.
12     Q.   Let me ask you to turn to the
13  last page.  It's something called a
14  verification.  Okay?
15     A.   Yes.
16     Q.   Does your signature appear
17  there?
18     A.   Yes.
19     Q.   And you understand you're
20  signing this verification saying that, to the
21  best of your knowledge, the information that
22  you're giving us in response to our written
23  questions is true and correct?
24     A.   Yes.

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 61

D. Anderson

1
2     Q.    Let me ask you to turn to
3  paragraph number two, after those -- after
4  those instructions.  That's the correct page.
5     A.    Uh-huh.
6     Q.    Okay.  And you were asked to
7  identify people that you believe to have
8  knowledge or information relating to your
9  allegations against KenCrest.  And you gave us
10  a list of people.  And I just want to ask you
11  about one there.  It's Lisa Douglas.  She's at
12  the end of that page.  Do you see that?
13     A.    Yes.
14     Q.    What was Lisa Douglas's role as
15  far as you know in any of the allegations that
16  you are making?
17     A.    She worked in HR.
18     Q.    Did you have any contact with
19  her during the course of your time, making any
20  complaints saying that you were discriminated
21  against or harassed?
22     A.    Yes.
23     Q.    Was Lisa Douglas involved in any
24  of the meetings with you?
25     A.    No.  I'm sorry.  Yes.  I had one

Page 62

D. Anderson

1
2  meeting with her when I went through my files.
3     Q.    When you went through your
4  files?
5     A.    Yes.
6     Q.    When was that?
7     A.    I believe that was in April.
8     Q.    You just asked to see your
9  personnel records, is that what you're saying?
10     A.    Yes.
11     Q.    And KenCrest let you see it, and
12  Lisa Douglas was the person that was there
13  with you?
14     A.    Yes.
15     Q.    Did she have any other
16  involvement?
17     A.    No.
18     Q.    Go to question number five.
19  That question is asking you to tell us what
20  your damages are.  Did you understand that
21  when you got these and were asked to respond?
22  We're trying to find out from you what you
23  think your losses are that you're seeking from
24  KenCrest in this case.  Do you understand
25  that?

Page 63

D. Anderson

1
2     A.    Yes.
3     Q.    And the first part of your
4  answer you say you used to work 40-hours-plus
5  per week and then when you were demoted you
6  were cut down to about 30 hours.  And, again,
7  isn't it correct that that was your choice
8  based on the schedule you wanted?
9     A.    I can't say it was my choice.
10     Q.    Well, you're going to have to
11  explain to me then how could you have gotten
12  more hours than 30 or 32 if you were limited
13  to working Saturday, Sunday and one other day?
14  The shifts aren't any longer than that; right?
15  It's 12 hours on Saturday and 12 hours on
16  Sunday and then it's eight hours -- the
17  regular shift would be eight hours during the
18  week; correct?
19          MR. ZAHNER: Objection to
20  form.
21          THE WITNESS: Correct.
22  BY MR. TURCHI:
23     Q.    Well, is that correct, the
24  regular shift is eight hours during the week?
25     A.    No, not at every site.

Page 64

D. Anderson

1
2  Different sites have different hours.
3     Q.    All right.  Sitting here today,
4  do you know of any sites in the eastern
5  region, the county outside of Philadelphia,
6  that KenCrest had available for you when you
7  were pushed back to an RA position that was an
8  open RA position that you claim you should
9  have had where you would have had more than 30
10  hours a week?
11     A.    Yes.
12     Q.    And where was that?
13     A.    That was in Willow Grove.
14     Q.    All right.  And did you
15  interview for that job?
16     A.    No.
17     Q.    And how do you know that that
18  job was open at that time?
19     A.    It was posted.
20     Q.    It was posted when?
21     A.    I don't know when.
22     Q.    Well, when did you go back to
23  being an RA?
24     A.    That was in May, I believe.
25     Q.    In May of -- at the end of May

Page 65

D. Anderson

1  of 2012, is that what you're --
2      Q.    I think it was May the 2nd, I
3  believe, when I was demoted.
4      Q.    Well, let's back up.
5      A.    I'm not sure.
6      Q.    Well, let's back up, because I
7  don't think your understanding what I'm asking
8  you. From the end of April 2012 till the end
9  of May or near the end of May you were on paid
10 administrative leave; correct?
11     A.    Yes.
12     Q.    So you weren't working at that
13 time in any position; correct?
14     A.    Correct.
15     Q.    So sometime after that, you
16 actually went to work as an RA?
17     A.    Yes.
18     Q.    So is it your position that this
19 job in Willow Grove was posted and available
20 to you during that time, before you started in
21 your RA position?
22     A.    Yes.
23     Q.    And it was posted meaning what?
24     A.    It was on --

Page 66

D. Anderson

1      Q.    It was on the website?
2      A.    Yes. And I think it was Ms.
3  Lamlin had set me up for an interview and they
4  said I hired someone outside for the position
5  and she couldn't go over the supervisor's head
6  there.
7      Q.    Well, let me back up then. So
8  she set you up for an interview but the job
9  had already been filled, is that what you're
10 saying?
11     A.    Yes.
12     Q.    If the job had already been
13 filled, did you expect KenCrest to push that
14 person out?
15     A.    I didn't know the job was
16 fulfilled until she told me that.
17     Q.    I'm not understanding you, so I
18 have to ask you these questions again.
19             Denise Lamlin was working
20 with you to try to find an RA position; is
21 that correct?
22     A.    Yes.
23     Q.    And did you tell Denise Lamlin
24 about the Willow Grove job or did she tell

Page 67

D. Anderson

1  you?
2      A.    She e-mailed me -- I believe she
3  e-mailed me the three lists of positions that
4  was open. And I believe it was the Willow
5  Grove area, because it wasn't far from my home
6  that I wanted. But she had told me by the
7  time that -- by the time -- I think she said
8  she posted, but she didn't know the job was
9  fulfilled or something like that.
10     Q.    Do you have any information from
11 any source that Denise Lamlin was not telling
12 you the truth at that time?
13     A.    No.
14     Q.    All right. So she originally
15 told you that Willow Grove was an option?
16     A.    Right.
17     Q.    Set up an interview for you;
18 correct?
19     A.    I don't know if she set the
20 interview up, but I know she e-mailed me the
21 list of sites that was available.
22     Q.    And was it shortly thereafter
23 she told you that job had already been filled
24 and she wasn't aware of that when she sent the

Page 68

D. Anderson

1  e-mail?
2      A.    Yes.
3      Q.    Any other positions that you're
4  aware of that were open RA positions that you
5  claim you could have gotten more than the
6  hours that you actually did receive?
7      A.    Not that I know of.
8      Q.    All right. Go to what is
9  question number seven. It's a page or two --
10 it's the next page, actually.
11            Question number seven we
12 asked you with regard to each of your claims
13 of discipline by Defendant as alleged in the
14 complaint, we asked you to identify certain
15 things. You remember when we went through
16 your lawsuit, your amended complaint, you
17 alleged a couple different times that you
18 received pretextual discipline. Do you
19 remember that?
20     A.    Yes.
21     Q.    So in this question, number
22 seven, we were following up with you and we
23 want you to tell us about those things. And
24 your counsel made an objection which may or

Page 69

```
 1            D. Anderson
 2   may not be ruled on some other time. But in
 3   addition to making the objection, you directed
 4   us to a document. Do you see the last
 5   sentence there says Plaintiff directs
 6   Defendant to document Bates stamped P-64 for
 7   responsive information, do you see that. It's
 8   the very end of number seven in bold.
 9       A.   Yes.
10            MR. TURCHI: All right.
11            (Exhibit D-1 is marked for
12   identification.)
13   BY MR. TURCHI:
14       Q.   Ms. Anderson, I'm showing you a
15   document we've marked today as Defendant's
16   Exhibit-1. I'll also point out to you that
17   down at the very bottom right-hand part of the
18   page, do you see that number, it says P-64?
19   Do you see that?
20       A.   No.
21       Q.   Under the stamp it says P-64.
22       A.   Yes.
23       Q.   Do you see that now?
24       A.   Yes.
25       Q.   Those are identification
```

Page 70

```
 1            D. Anderson
 2   numbers. When it says P, that means that your
 3   counsel produced them to us.
 4       A.   Okay.
 5       Q.   You'll see some later that start
 6   with a D. That means we produced it to your
 7   counsel?
 8       A.   Okay.
 9       Q.   They're just for identification.
10   And if you go back to interrogatory number
11   seven, the written question, number seven on
12   the other document, do you see that?
13       A.   Uh-huh.
14       Q.   The answer you gave us at the
15   end of this is -- basically you're telling us
16   go to P-64; am I correct?
17       A.   Yes.
18       Q.   All right. So you have P-64 in
19   your hand?
20       A.   I do.
21       Q.   All right. P-64 is a document
22   that's dated -- it's called KenCrest Services
23   disciplinary action; correct?
24       A.   Yes.
25       Q.   Are you familiar with this type
```

Page 71

```
 1            D. Anderson
 2   of document?
 3       A.   Yes.
 4       Q.   You saw them while you were at
 5   KenCrest?
 6       A.   Yes.
 7       Q.   Did you give out any of these --
 8       A.   Yes.
 9       Q.   -- to others when you were a
10   supervisor at KenCrest?
11       A.   Yes.
12       Q.   So this is typical KenCrest
13   procedure; right?
14       A.   Yes.
15       Q.   This document is dated April 11,
16   2012; right?
17       A.   Yes.
18       Q.   It says page one of two. But,
19   again, we don't have, at least currently, page
20   two here, because P-64 that you referred us to
21   is only one page. All right? Do you
22   understand that?
23       A.   I understand that.
24       Q.   This says that you were given a
25   written warning?
```

Page 72

```
 1            D. Anderson
 2       A.   Yes.
 3       Q.   What I want to ask you -- and
 4   you're going to get a chance to talk about
 5   this document later. But going back to number
 6   seven, remember, we're asking you in
 7   interrogatory number seven with regard to each
 8   of your complaints of discipline by Defendant
 9   as alleged in the complaint, identify the
10   date, the form of how you received the
11   discipline, the names of the people who
12   participated in the discipline, the substance
13   of each communication, whether there was
14   anybody else that was present that heard the
15   discipline you were getting, and the outcome,
16   whether it was a warning, reprimand or
17   suspensions.
18            Is it correct that the only
19   thing you cite us to in response to that
20   question is P-64?
21       A.   Yes.
22       Q.   Nothing else that you know of
23   that fits that category?
24       A.   I know of some other things.
25       Q.   Well, is there a reason why you
```

Anderson v Kencrest Services

Page 73

D. Anderson

1 didn't put them in this answer?
2    A.   I don't know why it's not put in
3 this answer.
4    Q.   Are there other disciplines that
5 you received from KenCrest during the course
6 of your time there that you claim were either
7 discriminatory or a form of harassment other
8 than this one that's marked currently now as
9 Defendant's Exhibit No. 1?
10   A.   Yes.
11   Q.   What other ones were there?
12   A.   There were other documents that
13 was the supervisory contacts that we discussed
14 earlier and there was other written letters.
15   Q.   Other written warnings?
16   A.   No.  There were letters.
17   Q.   Letters?
18   A.   Letters and e-mails.
19   Q.   Okay.  And you claim that those
20 were claims of discipline too, the letters or
21 e-mails?
22       Remember, the question only
23 asks you to tell us what discipline you
24 received that you're complaining about.

Page 74

D. Anderson

1 That's what question number seven asks.
2    A.   Uh-huh.
3    Q.   So are the letters and e-mails
4 disciplines as far as you're concerned, or is
5 it only the warnings and supervisory contacts?
6    A.   I think you're confusing me.
7    Q.   So let's back up.  Focus on
8 question number seven.
9    A.   Okay.
10   Q.   And it says, with regard to each
11 of your claims of discipline by Defendant as
12 alleged in the complaint -- and remember we
13 went through your complaint, your amended
14 complaint, the lawsuit; correct?
15   A.   Yes.
16   Q.   And in your complaint you say
17 that you received discipline that was either
18 pretextual or harassment/discrimination or
19 both; correct?
20   A.   Yes.
21   Q.   In response to that question,
22 tell us about the discipline you received that
23 you're complaining about, you pointed us to
24 one document, P-64; correct?

Page 75

D. Anderson

1    A.   Right.
2    Q.   If there are others, I just want
3 to know what they are.  That's why I'm asking
4 you this question.  I'm not trying to trick
5 you.  I just want to -- do you understand what
6 I'm asking you now?  What other discipline did
7 you receive from KenCrest that you're
8 complaining about?
9    A.   Well, I felt like some of our
10 meetings was discipline.  Like, one incident I
11 can speak of is when she had the whole staff
12 meeting --
13   Q.   She is Valerie Van Kirk, I
14 assume?
15   A.   Yes.  And Deborah Rowell was
16 there too.  And they all verbally attacked me.
17   Q.   They all meaning the staff?
18   A.   Yes.
19   Q.   Okay.  Go ahead.
20   A.   That's one that I can think of
21 off the top of my head.
22   Q.   What did the staff say during
23 that meeting?
24   A.   They were saying that I

Page 76

D. Anderson

1 shouldn't be the supervisor and they don't
2 like the way I do my job.  And they just was
3 really, really attacking me verbally.
4    Q.   These were people --
5    A.   They were saying I don't --
6    Q.   I'm sorry.  Go ahead.
7    A.   They were saying that I come to
8 work and I don't ask them about their parent
9 or how their parent's doing.  And, you know,
10 I'm not warm-giving.  And, you know, Valerie
11 Van Kirk was there and so was Deborah Rowell.
12 And, actually, they called that meeting.
13   Q.   Do you know why they called that
14 meeting?
15   A.   No, I do not.
16   Q.   And no understanding that the
17 people who were complaining about you in the
18 meeting had separately complained to Valerie
19 or to Deborah or both?
20       MR. ZAHNER: Objection to
21 form.
22 BY MR. TURCHI:
23   Q.   Do you have any understanding
24 about that?