# Exhibit 3

b

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 77

1          D. Anderson
2     A.   No.
3     Q.   Is it your position that Valerie
4  and Deborah made up this meeting and
5  orchestrated these complaints against you?
6     A.   That's not my position.
7     Q.   Okay.  Is that your belief?
8     A.   It's not my belief Deborah
9  Rowell was involved.  But it's my belief that
10  Valerie Van Kirk and the staff there worked up
11  this meeting to attack me.
12     Q.   But that's not what I'm asking
13  you.  And you're entitled to your belief.
14          Do you have any
15  understanding from any source that anybody
16  that worked on your staff made complaints to
17  Valerie Van Kirk about the way you supervised
18  that place?
19     A.   No.
20     Q.   Did anybody who worked under you
21  or anybody else that you came in contact with
22  at KenCrest ever tell you that they were aware
23  that Valerie was planting false information
24  about you with your staff in order to have a
25  meeting to attack you or anything like that?

Page 78

1          D. Anderson
2     A.   Yes.
3     Q.   And who told you that?
4     A.   Other staff.  You need the
5  names?
6     Q.   I need the names.
7     A.   Bernard.
8     Q.   Bernard what?
9     A.   I don't remember his last name.
10     Q.   He worked under you?
11     A.   Yes.
12     Q.   And when did he work under you?
13  For how long?
14     A.   The entire time of my
15  employment.
16     Q.   Okay.  And you don't remember
17  his last name?
18     A.   I don't remember his last name.
19     Q.   Anybody else?
20     A.   Phillip Watson.
21     Q.   Phillip Watson?
22     A.   Yes.
23     Q.   Anybody else?
24     A.   No.
25     Q.   Are Bernard and Phillip both in

Page 79

1          D. Anderson
2  the same type position?  They were RAs?
3     A.   Yes.
4     Q.   What did Bernard tell you?
5     A.   That they going to have a
6  meeting and they all talking about how they
7  gonna attack you and what was they gonna --
8  what they were claiming.
9     Q.   Let me back up.  Bernard said
10  they are going to have a meeting?
11     A.   Uh-huh.
12     Q.   Did you ask what he meant by
13  they?
14     A.   No, I didn't ask.
15     Q.   Did Bernard tell you at any time
16  that a KenCrest supervisor, whether it be
17  Valerie Van Kirk or Deborah Rowell or anybody
18  else, was planting false information with the
19  staff that worked under you so that they could
20  make complaints about you?
21     A.   Yes.
22     Q.   Bernard told you that directly?
23     A.   I'm not sure if it was those
24  words.
25     Q.   Well, what did he tell you?

Page 80

1          D. Anderson
2     A.   Well, he said that Valerie be
3  coming in here early in the morning before we
4  leave and be sitting down talking with the
5  other staff.  He leaves.
6     Q.   Okay.  So he wasn't there?
7     A.   No, but they --
8     Q.   Hold on.  So if he's not there,
9  it's correct that he couldn't hear what
10  Valerie Van Kirk said in this meeting;
11  correct?
12     A.   That's absolutely correct.
13     Q.   So what Bernard is reporting
14  back to you about Valerie's meeting with the
15  other staff comes from yet another source;
16  correct?
17     A.   Yes.
18     Q.   And who's that other source?
19     A.   What's her name?  Nokia, Nokia
20  Leslie I believe it is.
21     Q.   Is that a male or a female?
22     A.   That's a female.
23     Q.   Anybody else Bernard tell you
24  reported something to him?
25     A.   No.

Page 81

```
            D. Anderson
1
2     Q.   So let me see if I have this
3  right.  The information that you're telling us
4  about now which came from Bernard, you weren't
5  at the meeting you're talking about; correct?
6     A.   No.
7     Q.   And Bernard wasn't at the
8  meeting; correct?
9     A.   No.
10    Q.   So Bernard is telling you that
11 Nokia told him something about what happened
12 at that meeting?
13    A.   Yes.
14    Q.   All right.  Anything else
15 Bernard told you?
16    A.   No, not that I can remember.
17    Q.   Let's go to Phillip Watson.
18 What did Phillip Watson tell you?
19    A.   He told me that I should be
20 careful because Valerie is out to get me.
21    Q.   Did he explain anything more
22 than that?
23    A.   No.
24    Q.   Was Phillip Watson at this
25 meeting that you were referring to before that
```

Page 82

```
            D. Anderson
1
2  Bernard was not at?
3     A.   I don't know.  I didn't ask him
4  that.
5     Q.   Did Phillip Watson tell you
6  anything else that forms your belief that
7  Valerie Van Kirk or someone else at KenCrest
8  was setting up complaints from staff members
9  about you?
10    A.   No, not that I can recall.
11    Q.   So I got the whole list.  It's
12 Bernard whatever his last name is and Phillip
13 Watson; correct?
14    A.   Yes.
15    Q.   And the only thing Phillip
16 Watson told you was be careful because Valerie
17 is out to get you?
18    A.   Yes.
19    Q.   And he didn't explain how he
20 knew that or why he believed that?
21    A.   No.
22    Q.   And you didn't ask him?
23    A.   No.
24    Q.   Go to question number 14, a
25 couple pages into that.  We asked you in
```

Page 83

```
            D. Anderson
1
2  question number 14 about your claims of either
3  discrimination or harassment because you took
4  leave.  We asked you a series of questions
5  about whether you had any communications with
6  people at KenCrest -- that's 14A -- what their
7  names and addresses were, the substance of
8  those communications, whether anybody else was
9  there when you were having these
10 communications, and whether the communication
11 was oral or written.  And, again, your counsel
12 made an objection.  And then subject to that
13 objection, you said that when you attempted to
14 take an FMLA leave in or about July of 2011,
15 you were told by the human resources
16 department that you'd have to use your
17 personal time and your own physician.
18          Let's start with your
19 personal time.  Are you aware of what
20 KenCrest's policy is regarding FMLA leave and
21 whether the employee who is eligible for FMLA
22 leave has to take personal time concurrent
23 with that leave?  Are you aware of that policy
24 one way or the other?
25    A.   No, no.
```

Page 84

```
            D. Anderson
1
2     Q.   So you don't know, sitting here
3  today, whether what you're claiming you were
4  told by KenCrest was consistent with its leave
5  policy or not?
6     A.   No, I'm not sure.
7     Q.   And then you said you were told
8  you had to use your own personal physician.
9  What do you mean about that?  If you were
10 asking for FMLA leave, why would you think you
11 weren't going to have to use your own
12 physician?
13    A.   Because the injury was sustained
14 at work.
15    Q.   Were you asking for FMLA leave
16 or workers' comp leave?  In this answer you're
17 saying you were asking for FMLA leave.
18    A.   When I was asking for -- I
19 wasn't asking for that.  I don't think I was
20 asking for that.  I was asking for the needed
21 time I needed to heal.  And from my
22 understanding from when I went to the doctor,
23 they told me if my injuries flare up, I am to
24 go back to the workmen's comp doctor.
25    Q.   Well, we're somehow confused.
```

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 85

1          D. Anderson
2  I'm talking about your answer to number 14,
3  which says that in July of 2011 when you
4  attempted to take FMLA leave -- do you know
5  what FMLA leave is?
6      A.   Family medical leave of absence.
7      Q.   Do you know what workers' comp
8  leave is?
9      A.   When you get hurt on the job.
10     Q.   What you told us in this answer
11 that you verified to be true is that when you
12 went to the human resources department and
13 attempted to take FMLA leave, you were told
14 that you had to use your own personal time and
15 your own physician.  Was that true when you
16 wrote this or not?
17     A.   I'm not sure of your question.
18 I'm confused.
19     Q.   Were you sure of the question
20 when you answered it here, number 14?  Did you
21 know what was being asked when you answered
22 it?
23     A.   No, I'm not -- I'm not clear on
24 that.
25     Q.   But you verified this as being

Page 86

1          D. Anderson
2  true anyway; correct?
3      A.   Yes, I verified it.
4      Q.   Go to question number 20, which
5  is, again, a couple pages in near the end.
6  We're asking you in question number 20 about
7  your accusations that you claimed you were
8  wrongfully discharged because it had something
9  to do with your worker's comp leave.  Do you
10 see that?  We have already established, am I
11 correct, that you were never discharged by
12 KenCrest; isn't that correct?
13     A.   Yes, I was never discharged.
14     Q.   You were demoted?
15     A.   I was demoted.
16     Q.   Now, when did you take your
17 first workers' comp leave?  What was the
18 timing of your first workers' comp leave as
19 compared to FMLA?  Do you know that?  Was that
20 when you had the altercation with the client?
21     A.   Yes.
22     Q.   And that was, like, back in
23 December --
24     A.   That was December 2010.
25     Q.   -- 2010; correct?

Page 87

1          D. Anderson
2      A.   Yes.
3      Q.   Did you ever take a workers'
4  compensation leave after that?
5      A.   Yes.
6      Q.   When was that?
7      A.   That was the end of January, I
8  believe 2012.
9      Q.   2012; right?
10     A.   Yes.
11     Q.   And into 2013?
12     A.   Yes.
13     Q.   And at that time you had already
14 been demoted back to an RA; correct?
15     A.   Yes.
16     Q.   So while you were community home
17 supervisor, you only took one workers' comp
18 leave, that was 2010 into the early part of
19 2011; correct?
20     A.   Correct.
21     Q.   And am I correct that you were
22 demoted back to RA sometime in or around the
23 end of May or beginning of June of 2012?
24     A.   Yes.
25     Q.   All right.  So it was a year and

Page 88

1          D. Anderson
2  a half after you took your worker's comp leave
3  that you were demoted?
4      A.   Yes.
5          MR. TURCHI:  All right.
6  You can put that aside.
7          Let's take about a
8  five-minute break before I start something
9  else.
10         MR. ZAHNER:  All right.
11         (Break taken.)
12         (Exhibit D-2 is marked for
13 identification.)
14 BY MR. TURCHI:
15     Q.   We've marked, and I put in front
16 of you, a document identified as Defendant's
17 Exhibit-2.  Do you see that?
18     A.   Yes.
19     Q.   And that's a document that says
20 a job description for the title community home
21 supervisor; correct?
22     A.   Yes.
23     Q.   Is that a document that you're
24 familiar with?
25     A.   Yes.

Page 89

D. Anderson

1
2   Q.   And did you receive this when
3   you were hired as acting community home
4   supervisor?
5       A.   Slightly after.  I did receive
6   it, but it wasn't when I took the position.
7       Q.   Okay.  And if you look at the
8   last page, there's an acknowledgment there
9   that you signed that says you acknowledge
10  receipt of this job description and that it
11  was reviewed with you; correct?
12      A.   Yes.
13      Q.   And was it actually reviewed
14  with you?
15      A.   Yes.
16      Q.   Was it reviewed with you with
17  Valerie Van Kirk who also signed off on this?
18      A.   Yes.
19      Q.   Is there anything in your job
20  description that does not accurately reflect
21  what your duties were when you were community
22  home supervisor with KenCrest?
23      A.   Say that again.
24      Q.   Yeah.  Is there anything in the
25  job description that does not accurately

Page 90

D. Anderson

1
2   reflect the duties that were yours to perform
3   when you were community home supervisor for
4   KenCrest?
5       A.   No, sir, I don't think so.
6       Q.   I want to talk to you about your
7   current job and any jobs you may have had
8   since you left KenCrest.  Okay?
9       A.   Yes.
10      Q.   Where are you currently working?
11      A.   Today's Child.
12      Q.   Today's Child?
13      A.   Yes.
14      Q.   And what's your position?
15      A.   Lead teacher.
16      Q.   How long have you worked for
17  Today's Child in that position?
18      A.   Since February.
19      Q.   February of this year?
20      A.   Yes.
21      Q.   2013?
22      A.   2013, yes.
23      Q.   Okay.  And how many hours a week
24  do you work?
25      A.   Forty.

Page 91

D. Anderson

1
2   Q.   Is that -- do you know what I
3   mean by exempt or nonexempt?
4       A.   I don't.
5       Q.   Do you ever work overtime there?
6       A.   Yes.
7       Q.   If you work more than 40 hours,
8   do you get paid overtime?
9       A.   Yes.
10      Q.   And have you had full-time work,
11  at least 40 hours, since February of 2013 at
12  Today's Child?  Have you had full-time work
13  since you started that job in February of 2013
14  for Today's Child?
15      A.   Yes.
16      Q.   And have there been times you've
17  earned overtime?
18      A.   Yes.
19      Q.   Are you working in any other
20  jobs currently?
21      A.   No.
22      Q.   Have you since you got that
23  full-time job in 2013?
24      A.   No.
25      Q.   And what do you make an hour?

Page 92

D. Anderson

1
2       A.   $13 an hour.
3       Q.   And how about benefits?  Do you
4   receive benefits?
5       A.   None.
6       Q.   None at all?
7       A.   None.
8       Q.   Okay.  Where were you working
9   prior to getting that job in February of 2013?
10      A.   With KenCrest.
11      Q.   Okay.  You were in the RA
12  position?
13      A.   Yes.
14      Q.   And that was the same RA
15  position that you had since you were demoted
16  from CHS?
17      A.   Yes, sir.
18      Q.   And you worked about 30, 32
19  hours a week in that position?
20      A.   Yes.
21      Q.   Now, when you were working as an
22  RA at KenCrest, did you get benefits?
23      A.   Yes.
24      Q.   What was considered full time at
25  KenCrest for benefits?  Was it 30 hours?

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

---

Page 93

1              D. Anderson
2      A.   I think so.
3      Q.   All right.  During that same
4  period of time when you were working as an RA
5  for KenCrest until you take the job with
6  Today's Child, did you have any other jobs,
7  part time or full time?
8      A.   Yes.
9      Q.   And tell me about those jobs.
10     A.   They were TSS positions,
11 temporary work.
12     Q.   Was it from the same temporary
13 staffing agency that you mentioned before?
14     A.   Yes.
15     Q.   Have you given us, as far as you
16 know, the documents that reflect what you made
17 in those temporary positions?
18     A.   As far as I know, I believe so.
19     Q.   Did you get a W -- do you know
20 what I mean by W-2 or a 1099?
21     A.   It was a W -- it would be a W-2.
22     Q.   All right.  So --
23     A.   I think it would be a W-2.
24     Q.   So you would have a W-2 for 2012
25 from the temporary staffing agency; correct?

---

Page 94

1              D. Anderson
2  You earned money through that temporary agency
3  in 2012?
4      A.   I think -- I think so.  I think
5  so.  I'm not sure if I worked in 2012.
6      Q.   Well, let's back --
7      A.   I think so, yes.  I think so,
8  yes.
9      Q.   Do you have any recollection
10 sitting here today of how much you earned in
11 total through the temporary agency?
12     A.   No.
13     Q.   Is it correct that you quit your
14 job as an RA with KenCrest because you
15 received this offer to be a full-time worker
16 for Today's Child?
17     A.   No.
18     Q.   All right.  You did quit your
19 job at KenCrest as an RA; correct?
20     A.   Yes.
21     Q.   And that was sometime in March
22 of 2012; correct?
23     A.   Yes.
24     Q.   So were you working both full
25 time for Today's Child, 40 hours, and also

---

Page 95

1              D. Anderson
2  working for KenCrest for a period of time?
3      A.   Yes.
4      Q.   So why did you -- did you intend
5  on continuing in both jobs?
6      A.   Yes, sir.
7      Q.   So why did you quit the job as
8  an RA at KenCrest?
9      A.   The commute.
10     Q.   The commute was --
11     A.   Was a hardship to get there.  It
12 was about a 45-minute drive.
13     Q.   And that's the position that you
14 took after you were demoted?
15     A.   Yes.
16     Q.   And you worked in that position
17 for how many months?
18     A.   Maybe --
19     Q.   About nine months?
20     A.   Was it almost a year?
21     Q.   From around June of 2012 to
22 March of 2013; does that sound right?
23     A.   Yes.
24     Q.   After you quit the job -- let me
25 back up.

---

Page 96

1              D. Anderson
2          Before you quit the job
3  with KenCrest in March of 2013, did you apply
4  for any other RA jobs at KenCrest that would
5  have had a lesser commute?
6      A.   No.
7      Q.   Did you look to see whether
8  there were any available?
9      A.   No.
10     Q.   Did anybody at KenCrest tell you
11 -- back up.  Strike that.
12          Since you've obtained the
13 full-time job with Today's Child, have you
14 worked for anybody else?
15     A.   No.
16     Q.   So from February of 2013, except
17 for the period of time that overlapped when
18 you worked as an RA with KenCrest, you haven't
19 worked anyplace else except Today's Child?
20     A.   Correct.
21     Q.   Have you applied for work
22 anyplace else?
23     A.   No.
24     Q.   Have you looked for work
25 anyplace else?

---

Page 97

D. Anderson
1
2      A.   No.
3      Q.   When you were demoted and Denise
4  Lamlin was working with you to find an RA
5  job -- do you remember that?
6      A.   Yes.
7      Q.   -- did you have more than one
8  interview?
9      A.   I think so.  I think I had two.
10     Q.   Where was the job that you
11 didn't either except or receive?
12     A.   I think it was on Anderson --
13 Anderson Lane.
14     Q.   And where is that?  What county
15 is that in?
16     A.   I think that's still eastern.
17 And there was also one out in -- it was two.
18 I can't recall the other one.
19     Q.   So there was two others besides
20 the place you went to work for?
21     A.   Yes.
22     Q.   Where did you go work as an RA?
23     A.   Clifton -- not Clifton.  Erie
24 Avenue.
25     Q.   And that's the one that was like

Page 98

D. Anderson
1
2  a 45-minute commute for you?
3      A.   Yes.
4      Q.   Where do you live?
5      A.   Philadelphia.
6      Q.   If you lived in Philadelphia,
7  why was your preference not to work there?
8  You did state a preference not to work there;
9  correct?
10     A.   Right.  It wasn't -- it was the
11 hostile environment that caused me to
12 prefer -- I didn't say I wouldn't.  I just
13 told her I would prefer to work in the Willow
14 Grove area and the other county areas.
15     Q.   The hostile environment was at
16 Henry Avenue; correct?  That's where you
17 worked?
18     A.   Yes.
19     Q.   There were other homes in the
20 Philadelphia region?
21     A.   Right.
22     Q.   But you didn't want to go to any
23 of the other ones either?
24     A.   No, because the environment --
25 Valerie Van Kirk was the PD of several houses

Page 99

D. Anderson
1
2  in Philadelphia.  And they all work out of the
3  same Willow Grove home base, so they're all
4  connected.
5      Q.   Where is Mount Kirk?
6      A.   Mount Kirk, I think that's in
7  eastern also.
8               (Exhibit D-3 is marked for
9  identification.)
10 BY MR. TURCHI:
11     Q.   What I'm showing you is a
12 document we've marked as Defendant's Exhibit
13 No. 3.  And we've talked about this generally
14 before; correct?
15     A.   Yes.
16     Q.   Am I right that this is called
17 KenCrest Services supervisory contact sheet?
18     A.   Yes.
19     Q.   Which was given to you back in
20 May of 2010 by your then supervisor, Ms. Lee?
21     A.   Yes.
22     Q.   And it alleges that you were
23 getting this contact because of verbal abuse;
24 correct?
25     A.   Yes.

Page 100

D. Anderson
1
2      Q.   And did you sign off on that
3  document?
4      A.   Yes, sir.
5           MR. TURCHI: You can put
6  that aside.
7               (Exhibit D-4 is marked for
8  identification.)
9  BY MR. TURCHI:
10     Q.   Now, I'm handing you a document
11 we've marked as Defendant's No. 4.  Do you
12 have that?
13     A.   Yes.
14     Q.   Am I correct this is another
15 KenCrest Services supervisory contact sheet?
16     A.   Yes.
17     Q.   That you received and signed?
18     A.   Yes.
19     Q.   And this one was given to you by
20 Vicky Anderson; correct?
21     A.   Yes.
22     Q.   And your position at the time
23 was acting CHS?
24     A.   Yes.
25     Q.   And this was given to you around

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 101

```
1              D. Anderson
2   September 12th of 2010; correct?
3       A.   Yes.
4       Q.   What was the reason why you
5   received this?
6       A.   Let me read.
7       A.   Well, before reading it all
8   through, look up at the top.  Did Vicky
9   Anderson say the reason giving you this was
10  review site issues?
11      A.   Yes.
12      Q.   So read through what Ms.
13  Anderson wrote on here, and then I'll ask you
14  a couple questions.
15      A.   I can't really understand this
16  writing.
17      Q.   None of it?
18      A.   No, some of it.
19      Q.   Let me ask you some general
20  questions about it.  You can see at the top
21  and you can make out that Ms. Anderson said
22  the reason for the contact was review site
23  issues; correct?
24      A.   Yes.
25      Q.   Now, at this time, you were in
```

Page 102

```
1              D. Anderson
2   charge of this site; correct?
3       A.   Yes.
4       Q.   And Vicky Anderson was your
5   supervisor at the time; correct?
6       A.   Yes.
7       Q.   Does looking at this document in
8   any way refresh your recollection that, if you
9   weren't getting discipline, Ms. Anderson was
10  at least pointing out to you that there were
11  some issues that had to be dealt with at this
12  site?
13      A.   Could you repeat your question?
14      Q.   Yes.  We talked about this
15  earlier.  And without rehashing all of your
16  testimony, I asked you whether you received
17  any discipline or any counseling from the time
18  that you started as acting CHS and the time
19  you took your first medical leave.  Do you
20  remember when I asked you those questions?
21      A.   Yes.
22      Q.   I think your answer was, correct
23  me if I'm wrong, not that you remember?
24      A.   Right.
25      Q.   You don't remember getting any?
```

Page 103

```
1              D. Anderson
2       A.   Right.
3       Q.   So now we're looking at a
4   document which is in September of 2012;
5   correct?
6       A.   Right.
7       Q.   This is before you took any
8   medical leave; right?
9       A.   Right.
10      Q.   So it's a couple of months after
11  you're working as the acting CHS; right?
12      A.   Yes.
13      Q.   And Vicky Anderson -- by the
14  way, you're not making any claims in this case
15  that Vicky Anderson discriminated against you,
16  are you?
17      A.   No.
18      Q.   She didn't harass you, did she?
19      A.   I don't think she harassed me.
20      Q.   You haven't made any claims
21  about that in either your lawsuit or your
22  Answers to Interrogatories; correct?
23      A.   Right.
24      Q.   So is it your position that her
25  giving you this supervisory contact was
```

Page 104

```
1              D. Anderson
2   harassment?
3       A.   I don't recall this.
4       Q.   Well, you signed it, didn't you?
5       A.   It looks like my signature, but
6   I don't recall this.
7       Q.   That's okay.  Do you have any
8   reason to doubt, sitting here today, that this
9   is an authentic document?
10      A.   I don't know if it's authentic
11  or not.  I don't recall it.
12      Q.   Do you think somebody forged
13  your signature?
14           MR. ZAHNER: Objection to
15  form.
16           THE WITNESS: I'm just
17  telling you I don't recall this form.
18  BY MR. TURCHI:
19      Q.   That's fine.  Does reading it
20  bring back any recollection for you?
21      A.   It does not, no, sir.
22           MR. TURCHI: All right.
23  You can put that aside.
24           (Exhibit D-5 is marked for
25  identification.)
```

FrontinoReporting, LLC
www.frontinoreporting.com - 800 831-6637

Anderson v Kencrest Services

Dekeshia Anderson
December 3, 2013

Page 105

1          D. Anderson
2   BY MR. TURCHI:
3       Q.   I'm showing you the document
4   we've marked as Defendant's Exhibit No. 5.
5   It's a two-page document, and it is actually a
6   performance evaluation of you by Vicky
7   Anderson dated February 2nd of 2011; correct?
8       A.   Yes.
9       Q.   And if you look at the second
10  page, is that your signature?
11      A.   Yes.
12      Q.   Did Vicky Anderson go over
13  this --
14      A.   Yes.
15      Q.   -- evaluation with you?
16      A.   Yes.
17      Q.   All right.  And as of the time
18  of this evaluation, do you remember whether
19  you were still acting community home
20  supervisor or were you the full-fledged
21  community home supervisor?
22      A.   I don't remember.
23      Q.   Now, do you have -- did you have
24  any understanding at the time as to why this
25  performance evaluation was being conducted?

Page 106

1          D. Anderson
2       A.   I think it probably was time for
3   my evaluation.  I don't know.
4       Q.   You don't know, okay.  Now, how
5   did you perceive this evaluation to be when it
6   was given to you.  By that I mean, did you
7   think it was a good evaluation, a bad
8   evaluation, a fair evaluation, or something
9   else, whatever your perception was?
10      A.   I felt like it was fair.
11      Q.   So if you look at the overall
12  performance up top, it's checked that you meet
13  most expectations; right?
14      A.   Right.
15      Q.   Vicky didn't say that you met
16  all expectations; right?
17      A.   Right.
18      Q.   She didn't say that you exceeded
19  expectations and she didn't say that you
20  greatly exceeded expectations?
21      A.   No, she did not.
22      Q.   But she said that you met most
23  of them?
24      A.   Right.
25      Q.   All right.  And if you go down

Page 107

1          D. Anderson
2   the individual scores that she gave you, some
3   of them are meets most, a couple are exceeds,
4   a couple are greatly exceeds; correct?
5       A.   Yes.
6       Q.   Now, look at the second page,
7   there are areas of strengths, areas needing
8   development, and an action plan; correct?
9       A.   Yes.
10      Q.   The areas of strength, Vicky
11  said that your relationship with the residents
12  and the staff is positive, Dekeshia is a
13  strong supervisor and handles herself very
14  good under pressure; correct?
15      A.   Yes.
16      Q.   Did you think that was a fair
17  and accurate evaluation of how you were
18  performing at the time?
19      A.   Yes.
20      Q.   The areas that need development,
21  Vicky said that you need to stay on top of
22  doctors' appointments and filings, you need to
23  develop a system to teach staff to help her
24  with paperwork; correct?
25      A.   Yes.

Page 108

1          D. Anderson
2       Q.   Does reading that refresh your
3   recollection at all about whether Vicky or
4   anybody else at KenCrest had told you, from
5   the time that you started as acting CHS up
6   until this evaluation in February of 2011,
7   which is about now a six-month or thereabout
8   time frame, that they told you that you needed
9   improvement in your paperwork and in keeping
10  up on doctors' appointments for the residents
11  and things like that?  Does it refresh your
12  memory at all?
13      A.   Other than this time?
14      Q.   Reading it, does that refresh
15  your memory that anybody told you that before
16  you got this evaluation?
17      A.   Before I got it?
18      Q.   Yes.
19      A.   No, sir.
20      Q.   So it's your position that Vicky
21  Anderson never told you about these issues
22  that she mentioned you needed development on
23  before she gave you the evaluation?
24      A.   That's my position.
25      Q.   The action plan was that the

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 109

```
1              D. Anderson
2    project director -- who was that?
3        A.   That would be Valerie.
4        Q.   Van Kirk?
5        A.   No.  I'm sorry.  At that time,
6    that would have been Vicky -- the project
7    director?
8        Q.   You don't know for sure?
9        A.   I'm not sure.
10       Q.   In any event, it says, the
11   project director will continue to assist
12   Dekeshia in different training needed to
13   complete her role as CHS, such as supervisory
14   training coming up in the spring.
15            Did I read that accurately?
16       A.   Yes.
17       Q.   Did you understand at the time
18   that KenCrest believed that you still needed
19   further training as a CHS as of February of
20   2011?
21       A.   Yes.
22            MR. TURCHI: You can put
23   that aside.
24            (Exhibit D-6 is marked for
25   identification.)
```

Page 110

```
1              D. Anderson
2    BY MR. TURCHI:
3        Q.   I'm showing you a document we've
4    marked as Defendant's Exhibit No. 6.  This is
5    a KenCrest Services supervisory contact sheet
6    given to you by Valerie Van Kirk and it's
7    dated -- the date of the contact was February
8    28, 2011; is that correct?
9        A.   Yes.
10       Q.   Do you remember getting this
11   document?
12       A.   Yes.
13       Q.   Did you sign the document?
14       A.   Yes.
15       Q.   And did Valerie Van Kirk talk to
16   you about the contents of the document before
17   you signed it?
18       A.   Yes.
19       Q.   It says that the reason for the
20   contact was reports of not speaking positively
21   to staff; correct?
22       A.   Yes.
23       Q.   And is that what Valerie talked
24   to you about during this contact?
25       A.   Yes.
```

Page 111

```
1              D. Anderson
2        Q.   All right.  Do you have any
3    evidence or information of any kind from any
4    source sitting here today that before Valerie
5    Van Kirk gave you the supervisory contact
6    sheet and met with you about it, she did not
7    receive reports from other staff who were
8    working under you that you did not talk to
9    them either professionally or you were talking
10   to them in an improper tone or using profanity
11   or anything like that?
12       A.   That she did not?
13       Q.   Yeah.  Do you have any
14   information that -- what I'm asking you
15   basically is did Valerie make this up or do
16   you have any information that she didn't
17   receive reports from staff that led her to
18   meet with you?
19       A.   I have no information.
20       Q.   Okay.  And this, again, was not
21   the first time during your employment at
22   KenCrest that a supervisor met with you about
23   inappropriate verbal interaction with other
24   staff members; correct?
25       A.   Right.  It's not the first time.
```

Page 112

```
1              D. Anderson
2        Q.   And she pointed out that the
3    issue of concern was reports of speaking to
4    staff in unprofessional tones and language,
5    including use of profanity?
6        A.   That's what she pointed out.
7        Q.   Did you talk to her about this
8    in the --
9        A.   I did, and I wrote up a
10   grievance.
11       Q.   You wrote up a grievance about
12   this?
13       A.   Yes, I did.
14       Q.   And is it your position that
15   this supervisory contact sheet from Valerie
16   Van Kirk was a form of harassment or
17   discrimination?
18       A.   Yes.
19       Q.   And what's the basis of your
20   claim of that?
21       A.   It's not true.
22       Q.   You told Valerie it wasn't true?
23       A.   Yes.
24       Q.   Did you tell Valerie that the
25   people that were complaining to her about this
```

Anderson v Kencrest Services

Dekeshia Anderson
December 3, 2013

Page 113

D. Anderson

1  were making it up?
2      A.   Yes.
3      Q.   What did she say?
4      A.   That's when she told me that,
5  well, I used the prior supervisory contact for
6  backbone for this one.
7      Q.   So did you tell her that the
8  prior one wasn't true either?
9      A.   I did.
10     Q.   So when the prior supervisor
11 gave you, back in 2010, a supervisory contact
12 sheet on a similar issue, was it your view
13 that that was also discrimination or
14 harassment?
15     A.   No.
16     Q.   For how long was Valerie Van
17 Kirk your supervisor when she gave you this
18 contact at the end of February 2011?
19     A.   I came back in January 2011.  It
20 was a short time.  It was a short time.
21     Q.   Okay.  You can put that aside.
22     A.   Very short time.
23         (Exhibit D-7 is marked for
24 identification.)
25

Page 114

D. Anderson

1  BY MR. TURCHI:
2      Q.   I'm showing you a document we
3  marked as Defendant's Exhibit No. 7.  Are you
4  familiar with that document?
5      A.   Yes.
6      Q.   And this is a performance
7  evaluation that was given to you by Valerie
8  Van Kirk dated April 7, 2011; correct?
9      A.   Yes.
10     Q.   And did you remember getting
11 this from Valerie and talking to her about it?
12     A.   Yes.
13     Q.   Did you sign off on it?
14     A.   Yes.
15     Q.   And, again, this now is about
16 six weeks after Valerie Van Kirk gave you the
17 supervisory contact that you claim was
18 discrimination or harassment; correct?
19     A.   I'm sorry.
20     Q.   This was about six weeks after
21 the supervisory contact from Valerie Van Kirk
22 that we just went over, which you claim was
23 discrimination or harassment on her part;
24 correct?
25

Page 115

D. Anderson

1      A.   Yes.
2      Q.   When you got this evaluation
3  from Ms. Van Kirk, did you think it was -- did
4  you perceive it to be good, bad, fair, or
5  something else?
6      A.   I felt it should have been more,
7  because I felt like I was giving my all.
8      Q.   Okay.  Isn't it correct that she
9  gave you the same overall performance
10 evaluation that Vicky Anderson gave you just a
11 couple of months earlier?
12     A.   No.
13     Q.   It's not?
14     A.   No.
15     Q.   Then we're going to have to
16 compare them.  The overall performance
17 evaluation by Vicky Anderson was that you met
18 most expectations; right?
19     A.   The overall?
20     Q.   Take out the other form so that
21 you can compare them.  All right?
22     A.   All right.
23     Q.   Now, in fact, Vicky Anderson,
24 who you don't claim discriminated against you
25

Page 116

D. Anderson

1  or harassed you, in February of 2011 gave you
2  an overall performance evaluation of meets
3  most expectations; correct?
4      A.   Yes.
5      Q.   And, basically, two months
6  later, Valerie Van Kirk, who you do claim
7  discriminated against you and harassed you,
8  gave you the same overall performance
9  evaluation, which is meets expectations;
10 correct?
11     A.   Yes.
12     Q.   And, in fact, when you look at
13 the individual scores, some of the scores that
14 Valerie Van Kirk gave you were higher than the
15 scores that Vicky Anderson gave you two months
16 earlier, aren't they?
17     A.   Yes, some of them are.
18     Q.   And more of them are higher than
19 lower, aren't they?
20     A.   Yes.
21     Q.   Incidentally, in the evaluation
22 that you're getting April 7, 2011 from Valerie
23 Van Kirk, she points out there that you're
24 still on probation, do you see that?
25

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 117

D. Anderson
1
2  A.  I see that.
3  Q.  And, again, you're not familiar
4  with KenCrest's policy on probationary periods
5  for people who are promoted into different
6  jobs?  You told me earlier you're not familiar
7  with that?
8  A.  Right.
9  Q.  So you don't know whether that's
10  consistent with KenCrest's policy or not?
11  A.  Right, I don't know what that
12  is.  I don't know.
13  Q.  What I'm saying is you don't
14  know one way or the other?
15  A.  Of the probation period?
16  Q.  Yeah.  You don't know about the
17  policy, so you don't know whether she was
18  accurate or not?
19  A.  Not really.  Exactly.
20  MR. TURCHI:  Okay.  You can
21  put that aside.
22  (Exhibit D-8 is marked for
23  identification.)
24  BY MR. TURCHI:
25  Q.  I'm showing you now a document

Page 118

D. Anderson
1
2  we've marked as Defendant's Exhibit No. 8.
3  It's a two-page document.  It's dated May 23rd
4  of 2011.  And it's in the form of basically a
5  letter to you from Valerie Van Kirk; correct?
6  A.  Yes.
7  Q.  Do you remember getting this?
8  A.  Yes.
9  Q.  All right.  And is it your
10  position that this document that you received
11  from Valerie Van Kirk was a form of harassment
12  and discrimination?
13  A.  Yes.
14  Q.  All right.  So let's look at
15  what Valerie says to you.  The first thing she
16  says to you is, I am glad to have you as part
17  of my team and thank you for all that you do
18  for the residents of Henry Avenue.
19  Do you take that to be
20  harassment and discrimination?
21  A.  No.
22  Q.  She says, this is a follow-up to
23  our meeting in February of 2011 when I became
24  your project director.
25  Does that refresh your

Page 119

D. Anderson
1
2  recollection in any way that that was the time
3  she became your project director?
4  A.  It doesn't refresh anything, but
5  I see it here.
6  Q.  Okay.  In that meeting I
7  outlined my expectations for you and for the
8  smooth running of 5500 Henry Avenue.
9  Is that correct?  Did you
10  have a meeting with her where she pointed out
11  her expectations?
12  A.  Yes.
13  Q.  And did you think that that was
14  an appropriate thing for a new supervisor to
15  do with someone she was supervising?
16  A.  Very appropriate.
17  Q.  Okay.  She goes on to say, you
18  were provided a mentor, LE.
19  Do you know who that refers
20  to?
21  A.  LE?
22  Q.  Do you remember who your mentor
23  was?
24  A.  They assigned two, but I don't
25  remember.

Page 120

D. Anderson
1
2  Q.  Then pass over it.
3  You were provided a mentor
4  prior to my becoming your project director.
5  Is that correct?
6  A.  Yes.
7  Q.  So Valerie Van Kirk didn't
8  assign you a mentor?  Somebody else did?
9  A.  Yes.
10  Q.  And then she goes, who was put
11  in place to assist with helping you to learn
12  and implement your role as the supervisor of
13  the site.
14  Did I read that accurately?
15  A.  Yes.
16  Q.  As far as you knew, was that the
17  reason that you were provided a mentor?
18  A.  Yes.
19  Q.  Your mentor was removed in March
20  2011 and I began working with you personally
21  to help you adjust to my expectations and way
22  of working and managing Henry Avenue.
23  Did I read that correctly?
24  A.  You read it correctly.
25  Q.  Did she start working with you

Anderson v Kencrest Services

Dekeshia Anderson
December 3, 2013

Page 121

D. Anderson

1
2  at that time after your mentor to tell you how
3  she wanted the home to be run?
4      A.   I disagree with that.
5      Q.   Okay.  Do you disagree with the
6  proposition that she had the authority to tell
7  you how to run the home?
8      A.   No, I don't disagree with that.
9      Q.   There are a number of points in
10 the next sections of this document that I
11 would like you to review.  And I only have one
12 question for you on each one of them.
13     A.   Okay.
14     Q.   And the question is, is there
15 anything that she's -- I'm not asking you to
16 agree with what she's saying.  Is there
17 anything in any of the points of issue that
18 she's pointing out in this letter to you that
19 were not part of your duties as a community
20 home supervisor?  Do you understand what I'm
21 asking you?
22     A.   Yes.
23     Q.   So go ahead and read it.  And if
24 you see anything in there, point it out to me.
25          Have you had a chance to

Page 122

D. Anderson

1
2  read through it?
3      A.   Yes.
4      Q.   I would reiterate my question.
5  I'm not asking you to agree or disagree with
6  what she says.  Valerie in this letter to you
7  is pointing out areas of concern that she
8  thinks you need to improve on as a CHS; is
9  that correct?
10     A.   No.
11     Q.   No?
12     A.   No.
13     Q.   What is she doing in the letter?
14     A.   She's just laying out what she
15 wants done.
16     Q.   Let me just give you an example.
17 Under documentation it says the communication
18 books for the guys are not having your
19 initials consistently.  Isn't that something
20 that she's pointing out that you need to do
21 better?
22     A.   No, not better.  That's what
23 she's saying she wants done.  The other
24 supervisor didn't require that.  So this is
25 her requirement under her supervision.

Page 123

D. Anderson

1
2      Q.   Fair enough.  Again, did you
3  believe that she had the authority to tell you
4  how she expected you to do your job as a CHS?
5      A.   Yes.
6      Q.   Even if the other supervisor
7  didn't expect that?
8      A.   Yes.
9      Q.   So are all of the points that
10 she brought up here, whether you agree that
11 she's pointing out for improvement or not, are
12 they consistent with what your job description
13 was as a community home supervisor?
14     A.   Yes.
15          MR. TURCHI: You can put
16 that aside.
17          (Exhibit D-9 is marked for
18 identification.)
19 BY MR. TURCHI:
20     Q.   Before I ask you about that
21 document, I neglected to ask you a couple of
22 things.
23          Before you became the
24 acting community home supervisor at KenCrest,
25 had you ever held a job as a supervisor for

Page 124

D. Anderson

1
2  any other employer?
3      A.   Yes.
4      Q.   And how many times?
5      A.   Once before.
6      Q.   And what type of work was that?
7      A.   Teaching.
8      Q.   For whom?
9      A.   Elijah Palmice (phonetic)
10 Academy.
11     Q.   And in the teaching role, who
12 did you supervise?
13     A.   The teachers.  I was the lead
14 teacher.
15     Q.   Okay.  The lead teacher in a
16 particular class or more classes?
17     A.   Over the school.  It was a
18 private school.
19     Q.   And when did you serve in that
20 role?
21     A.   I'm not sure of the dates.
22     Q.   For how long did you serve,
23 about how long?
24     A.   Maybe about a year or two.
25     Q.   And why did you leave that job?

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 125

1          D. Anderson
2      A.   The school closed.
3      Q.   Any other supervisory positions?
4      A.   No.
5      Q.   Did you ever have a supervisory
6  position in any business that was similar to
7  the business that KenCrest conducts?
8      A.   No.
9      Q.   Now you can go to that document.
10     A.   Okay.
11     Q.   Showing you what we've marked as
12  Defendant's Exhibit No. 9, it's a three-page
13  document.  And if you look at the last page,
14  can you confirm that you signed this document?
15     A.   Yes.
16     Q.   You signed it?
17     A.   Yes.  I'm sorry.  Yes.
18     Q.   Okay.  Now, this is dated --
19  it's typewritten June 20th, but there's
20  handwritten July 20th of 2011.  Do you see
21  that?
22     A.   Yes.
23     Q.   Do you remember getting this
24  document from Valerie Van Kirk?
25     A.   Yes.

Page 126

1          D. Anderson
2      Q.   And Valerie's notes are this was
3  reviewed with you July 20, 2011 at 9 p.m.  Do
4  you remember that?
5      A.   No.
6      Q.   Do you have any reason to
7  believe that that's not accurate or you just
8  don't remember one way or the other?
9      A.   I don't remember the time that I
10  received it.  However, I do remember the
11  document.
12     Q.   Okay.  Now, by the time, you're
13  talking about the time of day or around the
14  time period?
15     A.   I don't remember the time
16  period, time, day.  I don't remember.
17     Q.   All right.  Now, is it your
18  position that this document you received from
19  Valerie Van Kirk and the discussion you had
20  about it was a form of harassment and
21  discrimination?
22     A.   Yes.
23     Q.   So let's read some of the things
24  that Valerie is pointing out.  She says she's
25  been your supervisor since February 2011.  She

Page 127

1          D. Anderson
2  says that prior to her becoming your
3  supervisor, you had a mentor for several
4  months who was put in place to assist you in
5  gaining insight and skill on the proper
6  handling of the site and individual-level
7  management.
8          Did I read that correctly?
9      A.   You read it correctly, yes.
10     Q.   Did that not happen the way she
11  cited it?
12     A.   Not exactly.
13     Q.   What was the purpose of you
14  having a mentor?
15     A.   Well, it was -- the purpose was
16  to show me how the adult services ran, because
17  Henry Avenue was just taken over by adult
18  services.  It was under children when I was
19  working with them.  The mentor was to show me
20  how the adult services run things.  But the
21  mentor only showed up once or twice, maybe.
22     Q.   All right.  So you're not
23  contesting that you either were provided a
24  mentor or what the mentor's role was supposed
25  to be, but what you're saying is the mentor

Page 128

1          D. Anderson
2  didn't give you enough training?
3      A.   Right.  I didn't get any
4  training.
5      Q.   Did you complain to somebody?
6  Anybody?
7      A.   I did.
8      Q.   Who did you complain to?
9      A.   Valerie Van Kirk.
10     Q.   Do you have anything in writing
11  to Valerie saying that your mentor --
12     A.   No.
13     Q.   So your complaints were verbal?
14     A.   I'm not sure if I put it in
15  writing or not.  I'm not -- I may have.  I'm
16  not sure.
17     Q.   Okay.  In the next paragraph
18  Valerie says I have been providing you with
19  the necessary tools and mentoring in an
20  ongoing basis since you became part of my
21  cluster.
22          Did I read that accurately?
23     A.   You read it accurately.
24     Q.   Do you take exception to that
25  statement?

Anderson v Kencrest Services

Dekeshia Anderson
December 3, 2013

D. Anderson

1
2   A.   Yes.
3   Q.   So you claim that she did not --
4   she was not providing you with necessary
5   tools?
6   A.   Right.
7   Q.   Did you complain to somebody
8   about that?
9   A.   Yes.
10  Q.   Who did you complain to?
11  A.   I complained to her about it.
12  Q.   In writing or verbal?
13  A.   Verbal.
14  Q.   The next thing she says is, I
15  realize that your role is not an easy one and
16  I believe that you want to do well.  I feel at
17  this point you are still lacking the skills
18  and knowledge that you need to be a successful
19  community home supervisor.
20        Did I read that accurately?
21  A.   Yes.
22  Q.   Did Valerie express that to you
23  in the meeting that you had?
24  A.   What?  This one?
25  Q.   That statement.  Did she express

D. Anderson

1
2   see that?
3   A.   Yes, I see that.
4   Q.   Do you remember her telling you
5   that during this meeting?
6   A.   I don't remember the meeting.
7   Q.   So you don't remember this
8   meeting at all?
9   A.   No.  I remember this paperwork,
10  but I don't remember having a meeting.
11  Q.   So you don't remember whether
12  she went over this, you don't remember whether
13  you contested any of these things?
14  A.   Right.
15  Q.   Because you just don't remember
16  the meeting, period?
17  A.   I don't remember the meeting.
18  Q.   Go down to what is the third
19  bullet point, which starts with medical
20  appointments, for the most part you are
21  keeping up with medical appointments.  Did you
22  take that to be a form of discrimination or
23  harassment, her telling you that for the most
24  part you were keeping up with the
25  appointments?

D. Anderson

1
2   to you that she thought you were lacking in
3   certain skills?
4   A.   No.
5   Q.   You didn't talk about that when
6   you went over this with her?
7   A.   No.  She just read this off.
8   This meeting?
9   Q.   She read this off?
10  A.   Yes.
11  Q.   Did you talk to her about it?
12  A.   I don't think so.  I don't
13  really recall, but I don't think so.
14  Q.   The next section, she says,
15  below are some of my concerns.  And among
16  other things in the first paragraph, she says,
17  things are out of order and paperwork is
18  missing.
19        Is that accurate at that
20  time?
21  A.   Where are --
22  Q.   I'm at the very first bullet
23  point at the end where she says things are out
24  of order and paperwork is missing.  Things are
25  out of order and paperwork is missing.  Do you

D. Anderson

1
2   A.   I don't remember this meeting.
3   Q.   All right.  She then goes on to
4   say, but recently there were two mishaps.
5   Now, whether you remember the meeting or not,
6   do you remember on or around this time period,
7   which was July 20th of 2011, that there were
8   two mishaps with medical appointments for
9   residents?
10  A.   Yes.
11  Q.   So did those two mishaps occur?
12  A.   Yes.
13  Q.   And as the community home
14  supervisor, am I correct that you were -- even
15  if you weren't personally at fault, you were
16  responsible for the home and these
17  appointments were supposed to be kept
18  properly?
19  A.   Yes.
20  Q.   So was that a form of harassment
21  or discrimination, her pointing out to you
22  something that was supposed to be within your
23  realm of responsibility?
24  A.   No.
25  Q.   How about the next bullet point,

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

---

Page 133

D. Anderson

1    which you can read, but that talks in sum or
2    substance about address getting a free cell phone for
3    one of the residents, did that happen the way
4    Valerie stated it here?
5    A.   I remember the cell phone, but I
6    remember doing the paperwork for it, so I
7    don't -- I don't know why she would put that
8    there.
9    Q.   Well, she says in this part that
10   she reminded you about it and you went and
11   purchased them a phone from the store which is
12   prepaid.  Is that what you did?
13   A.   I don't recall that, but I
14   remember doing paperwork for him to get his
15   phone.
16   Q.   But you don't remember whether
17   that was a paid phone or not?
18   A.   I don't -- I don't recall.
19   Q.   What she's saying in here, in
20   sum or substance is, you should have gotten
21   him a free phone?  Isn't that what she's
22   saying here?
23   A.   Yeah.  And I'm saying I filled
24   out the paperwork for that.

*(line numbers 1-25)*

---

Page 134

D. Anderson

1    Q.   I thought you said you don't
2    remember whether --
3    A.   I did --
4    Q.   Hold on -- whether it was for a
5    paid-for or a free phone?
6    A.   I said I remember doing the
7    paperwork for the phone.
8    Q.   Paid phone or free phone?
9    A.   I don't know which phone.
10   Q.   That's what I'm saying.  You
11   don't remember whether the paperwork you
12   filled out was to buy him a phone or whether
13   it was to get him a free phone, as she is
14   suggesting?  You just don't remember?
15   A.   Right.
16   Q.   Okay.  The next bullet point,
17   she says, you are completing monthly staff
18   training reminders as requested.
19         Again, as she did in
20   previous parts of this document, she's
21   pointing out you did something correctly.
22   She's not complaining about you there.  She's
23   saying you did this.  But she goes on to say,
24   you also have to ensure that you are

---

Page 135

D. Anderson

1    monitoring your schedule and making the
2    necessary changes to address where the staff
3    trainings are falling short.  She says, you
4    had two staff overdue on mandatory trainings
5    who both work on the overnight shift.  The
6    good thing is that you have two overnight
7    staff.  But if only one is doing the
8    transportation that would mean we are out of
9    compliance.
10         Do you remember her reading
11   this to you?
12   A.   No.
13   Q.   Do you remember anything about
14   it?
15   A.   No.
16   Q.   Do you remember whether, from
17   this document or not, at this period of time,
18   do you remember that there were two staff
19   overdue on mandatory training?
20   A.   No.
21   Q.   You don't remember one way or
22   the other?
23   A.   No.
24   Q.   She points out in the next

---

Page 136

D. Anderson

1    bullet point that there was, among other
2    things, a site issue relating to a broken
3    toilet seat.  Do you remember that actually
4    occurring at or around this time?
5    A.   Yes.
6    Q.   And would she be correct that
7    that's something that -- again, whether you
8    need to replace it yourself or get it
9    replaced, as the CHS, you're responsible for
10   making sure that happens; correct?
11   A.   Yes.
12   Q.   All right.  And she was
13   concerned or she's saying in there she's
14   concerned about a resident getting hurt on a
15   broken toilet seat, which is possible;
16   correct?
17   A.   I'm sorry?
18   Q.   Is it possible that a resident,
19   if a toilet seat was broken, and this was
20   wooden or plastic, could get cut on it or
21   something like that?  Isn't that what she's
22   saying in this bullet point?
23   A.   That's what she's saying, yes.
24   Q.   And in the business that

---

---

Page 137

D. Anderson

1  D. Anderson
2  KenCrest is in, isn't it correct that you
3  always have to be concerned about claims of
4  negligence brought by a family member of one
5  of the residents?  That's a big concern in
6  your business, isn't it?
7      A.   Yes.
8      Q.   The next thing she points out is
9  an unsanitary issue with a shower curtain;
10  correct?
11      A.   Yes, that's what's pointed out.
12      Q.   And she's taking exception here
13  and she's saying she shouldn't have to address
14  this when she comes to a site review, that's
15  for you to do, that's what the CHS job is.  Do
16  you take exception to that statement?
17      A.   What's your question?
18      Q.   Do you agree that it was your
19  job as the CHS, if there's an unsanitary
20  condition in a bathroom with a shower curtain,
21  that you get it replaced?  The project
22  director shouldn't have to come there and say
23  replace that?
24      A.   I agree, if it's happening.
25      Q.   Do you remember whether it was

---

Page 138

D. Anderson

1  D. Anderson
2  happening or not?
3      A.   No, sir.
4      Q.   You don't remember one way or
5  the other?
6      A.   No.  I don't remember any torn
7  shower curtain in Mercedes' room.  MC is
8  Mercedes.
9      Q.   I hear you.  We might be just
10  losing translation, and I just need to get it
11  clear.  Do you remember one way or the other?
12  Are you saying there was no torn shower
13  curtain, or are you just telling me, as you
14  have in the past, I don't remember?
15      A.   I'm saying there wasn't none.
16      Q.   So this was made up you're
17  saying?
18      A.   I believe so.
19      Q.   The last thing she says in the
20  way of a concern is, I am still receiving
21  complaints about the way you are speaking or
22  responding to staff as well as a family
23  member.  We have discussed this on numerous
24  occasions and each time you assure me that you
25  are speaking to staff as well as family in a

---

Page 139

D. Anderson

1  D. Anderson
2  professional manner.
3          Did I read that accurately?
4      A.   You did read that accurately.
5      Q.   Do you remember, sitting here
6  today, that she read this to you during this
7  meeting?
8      A.   No, I don't remember this
9  meeting.
10      Q.   I thought you told me earlier
11  you remember her reading this to you, but you
12  don't remember any discussion about it?
13      A.   Right.
14      Q.   Is that accurate?
15      A.   Yes.
16      Q.   So do you remember that she read
17  this to you when she gave you this?
18      A.   We read over this, yes.
19      Q.   Do you have any information from
20  any source that, as of the time of this
21  meeting or this contact or whatever it was,
22  around July 20th of 2011, do you have any
23  information that Valerie wasn't still
24  receiving from staff members complaints about
25  the way you spoke to them?

---

Page 140

D. Anderson

1  D. Anderson
2      A.   No.
3      Q.   All right.  How about a family
4  member, do you have any information that
5  Valerie didn't receive from some source that a
6  family member complained that you didn't speak
7  professionally?
8      A.   No, I have no information on it.
9          MR. TURCHI:  All right.
10  You can put that aside.
11          (Exhibit D-10 is marked for
12  identification.)
13  BY MR. TURCHI:
14      Q.   This is a one-page document
15  we've marked as Defendant's Exhibit No. 10.
16  This is an internal KenCrest document.  We
17  produced it to your counsel.  You can see down
18  the bottom it's marked Defendant's 191.  Do
19  you see that?
20      A.   Yes.
21      Q.   I'm not going to ask you
22  questions about the document itself.  You're
23  not part of this e-mail chain.  I just want to
24  ask you some questions about whether some of
25  this occurred.

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 141

D. Anderson

1
2       You see that in the top
3  part it says, hi Lois.  That's Valerie Van
4  Kirk addressing Lois Johnston.  Do you know
5  who Lois Johnston is?
6       A.   She's a person in HR.
7       Q.   At the time, do you know her to
8  be an HR person back in July of 2010?
9       A.   Yes.
10      Q.   I'm sorry, 2011?
11      A.   Yes.
12      Q.   And you see the date of this
13  e-mail from Valerie to Lois is July 21st?
14      A.   Right.
15      Q.   And you remember the date of the
16  previous document, July 20th?
17      A.   Yes.
18      Q.   Is that correct?
19      A.   Yes.
20      Q.   In the first part of Valerie's
21  e-mail to Lois, she says, yesterday Debbie and
22  I met with Dekeshia and her staff regarding
23  concerns brought by the staff, as well as
24  Dekeshia.  Do you remember that?
25      A.   The meeting?

Page 142

D. Anderson

1
2       Q.   Do you remember the meeting?
3       A.   Yes.
4       Q.   And is it correct that you had
5  brought up concerns to either Debbie or to
6  Valerie?
7       A.   I may have.
8       Q.   So the meeting that was taking
9  place was, according to Valerie, in response
10  to both your issues and the staff issues?  Is
11  that how you remember it?
12      A.   No.
13      Q.   Well, how do you remember it?
14      A.   I remember one of the staff
15  telling me that there was going to be a
16  meeting.  She never told me that she was
17  setting up a meeting because of anything I
18  discussed with her.
19      Q.   All right.  That's not what I
20  asked you, but okay.  At the meeting, did
21  Valerie and Deb air your concerns and the
22  staff's concerns?
23      A.   No.
24      Q.   Did they air the staff's
25  concerns?

Page 143

D. Anderson

1
2       A.   Yes.
3       Q.   She goes on to say that the
4  meeting was very challenging for Dekeshia
5  because it was a lot of negative information,
6  but we, Debbie and I, felt that would help us
7  to clear the air.
8       Was there a lot of negative
9  information brought up by the staff about you
10  during that meeting?
11      A.   Yes.
12      Q.   She goes on to say, we addressed
13  the situations and we hoped that they could
14  move past it.
15      Was that discussed at the
16  meeting?
17      A.   No.
18      Q.   There was nothing said by Deb or
19  by Valerie at the meeting along the lines
20  of -- and I'm not saying they said these
21  actual words, but something like this -- you
22  guys have to work together; the mission is to
23  take care of the residents; if you have petty
24  differences between yourselves, you have to
25  put them aside and everybody has to work

Page 144

D. Anderson

1
2  together?  You heard nothing like that at that
3  meeting?
4       A.   I don't recall that.
5       Q.   She goes on to say that I later
6  met with Dekeshia one on one -- is that
7  correct?  Is that when she read that letter to
8  you?
9       A.   I'm not sure.
10      Q.   -- regarding my observations and
11  concerns which actually had nothing to do with
12  the issues at the meeting.  I talked to her in
13  length explaining why her role is so important
14  with the way things happen and run at Henry.
15  I asked her to open up and be the leader as
16  CHS is expected to be.  She expressed that she
17  is not really wanting to open her circle to
18  her staff, but in order to be successful she
19  will have to.
20      Do you remember having
21  anything like that discussion with Valerie Van
22  Kirk on or around July 20th of 2011?
23      A.   Yes.
24      Q.   The next part of this e-mail is
25  Valerie saying to Lois Johnston, today, I

Page 145

D. Anderson

1
2  received a call from Dekeshia stating that the
3  air at the house is not working.
4           Do you remember making that
5  call?
6     A.  No.
7     Q.  She said staff told her as she
8  was walking out of the door.  Instead of her
9  going back to assist them, she said fill out a
10 maintenance request form and call on-call, no
11 call Val.  She's working.  She can help you.
12          Do you remember telling
13 that to your staff members when they reported
14 that the air conditioning wasn't working?
15    A.  Yes.
16    Q.  All right.  Do you remember --
17 let me read what she says.  Valerie says she
18 asked you did they know where to find a
19 maintenance request form and do they know how
20 to fill it out.  She said they should know.
21          Do you remember saying that
22 to Valerie?
23    A.  No.
24    Q.  I again asked do they know how
25 and where to find what they needed.  She said

Page 146

D. Anderson

1
2  Phillip, outside staff, and Varney, new staff,
3  should know.
4           Do you remember that part
5  of the discussion?
6     A.  No.
7     Q.  I called the house and asked
8  Phillip did he know where find a maintenance
9  request form and he said no.
10          Do you have any information
11 that that does not accurately reflect
12 Valerie's conversation with Phillip?
13    A.  Do I have information
14 about their conversation?
15    Q.  Yeah.  Do you know whether that
16 took place or not?
17    A.  I'm sorry?
18    Q.  Do you know whether that took
19 place or not?
20          MR. ZAHNER:  Objection to
21 form.
22          THE WITNESS:  I'm not sure
23 what you're saying.
24 BY MR. TURCHI:
25    Q.  All right.  Valerie is saying

Page 147

D. Anderson

1
2  after you had a conversation with her about
3  this air conditioning issue, she called
4  Phillip.  And she asked Phillip do you know
5  where the maintenance forms are, and he said
6  no.
7           Do you have anything to
8  refute that?  Do you know whether that
9  happened or not?
10          MR. ZAHNER:  Objection to
11 form.
12          THE WITNESS:  I don't know.
13 BY MR. TURCHI:
14    Q.  Okay.  You don't know whether it
15 happened or not?
16    A.  Right, I don't know.
17    Q.  What she's going on to say,
18 Valerie in this e-mail, this instance shows
19 that she did not hear anything that was said
20 to her yesterday.  She is not showing
21 leadership skills.  I have spoken to Debbie
22 regarding this issue.  And it just seems that
23 she does not want to show the necessary
24 interest that she should be.
25          You can put that aside.

Page 148

D. Anderson

1
2          MR. ZAHNER:  Objection to
3  form.
4           MR. TURCHI:  Form?  I
5  didn't ask a question.
6           MR. ZAHNER:  Well, that's
7  all.
8           (Exhibit D-11 is marked for
9  identification.)
10 BY MR. TURCHI:
11    Q.  I'm showing you what we marked
12 as Defendant's Exhibit No. 11.
13    A.  Okay.
14    Q.  Now, this is a document that you
15 prepared and signed; correct?
16    A.  Yes.
17    Q.  And it's dated July 27, 2011;
18 correct?
19    A.  Yes.
20    Q.  And it's shortly after the
21 letter that you received and at least remember
22 having read to you by Valerie Van Kirk where
23 she was pointing out what she believed to be
24 certain issues with the way that you were
25 running the home; correct?

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 149

D. Anderson

1
2    A.   Yes.
3    Q.   And this is the first complaint
4    that you made of any sort to KenCrest, whether
5    it be human resources or anybody else, of
6    discrimination or harassment; is that correct?
7    A.   In writing, yes.
8    Q.   You made other complaints?
9    A.   I talked to Valerie about how I
10   felt how she was treating me.
11   Q.   Did you tell Valerie that you
12   thought she was discriminating and
13   harassing --
14   A.   I told her I --
15   Q.   Hold on.  Hold on.  Let me
16   finish.  Did you tell Valerie before you wrote
17   this letter at any time -- or anybody else for
18   that matter, you can tell me anybody else too
19   -- that you believed you were being
20   discriminated against and/or harassed because
21   of your medical conditions?
22   A.   I told Valerie Van Kirk I felt
23   like since I returned back to work you have
24   been harassing me about my job.
25   Q.   Okay.  When did you tell -- let

Page 150

D. Anderson

1
2    me back up.  Harassing you about your job or
3    harassing you because you had medical
4    conditions?  What did you tell her?
5    A.   My words to her was I felt like
6    I was being harassed by her.
7    Q.   When did you tell her that?
8    A.   I don't know the date.
9    Q.   Did you tell her once or more
10   than once?
11   A.   I probably told her a few times,
12   but I'm not sure of dates.
13   Q.   Did you tell her anything more
14   than that you felt like you were being
15   harassed?
16   A.   No.
17   Q.   Did you mention you were being
18   harassed because you took medical leave?
19   Start with that.  Did you tell Valerie you
20   thought you were being harassed because you
21   took medical leave?
22   A.   No.
23   Q.   Did you tell Valerie you thought
24   you were being harassed because of medical
25   conditions?

Page 151

D. Anderson

1
2    A.   No, I didn't tell her that.
3    Q.   Did you tell her you thought you
4    were being harassed because you took workers'
5    compensation leave?
6    A.   No.
7    Q.   You just said you thought you
8    were being harassed?
9    A.   Yes.
10   Q.   And was that in response to her
11   pointing out to you these issues of concern
12   that she thought were appropriate?  Is that
13   when you told her you thought you were being
14   harassed?
15   A.   I'm sorry?
16   Q.   You don't remember when you told
17   her?
18   A.   Right.
19   Q.   But what I'm asking you now is,
20   did you tell her in response to getting from
21   her any of these other things that we've
22   looked at today, the supervisory contact, the
23   performance evaluation, the letter that she
24   pointed out these issues that we just went
25   over?

Page 152

D. Anderson

1
2    A.   I told her that because of those
3    things, along with her behaviors towards me,
4    her hostility towards me.
5    Q.   Okay.  Did she ever exhibit any
6    hostility towards you which was anything other
7    than telling you I don't think you're doing
8    that right, I want you to do it this way?
9    A.   Yes.
10   Q.   And when was that, and what did
11   she say to you or do to you?
12   A.   Well, we spoke of it earlier
13   when she told me that I'm not hurt, nothing is
14   wrong with you, and things like a that.
15   Q.   And you don't remember when
16   those conversations took place?
17   A.   I don't remember the dates, no.
18   Q.   All right.  Look at the document
19   now.  It's Defendant's No. 11.  And we've
20   established you sent this to human resources;
21   correct?
22   A.   Yes.
23   Q.   And you said, among other
24   things, since you returned to work in January
25   of 2011, I have been given a contact and many

Page 153

D. Anderson
1
2   other meeting about my work ethic.
3            What did you mean by work
4   ethic?
5       A.   The way I was working.
6       Q.   Did Valerie, either verbally or
7   in any of these contacts we talked at, say
8   anything about your work ethic, in other
9   words, how many hours you were working or
10  whether you were there on time or whether you
11  left early or anything like that?
12      A.   Yes.
13      Q.   What did she say about that?
14      A.   She was saying that I was taking
15  too much overtime.  She said that before, not
16  in the written documents.
17      Q.   You were taking too much
18  overtime?  You mean working too much overtime?
19      A.   Yes.
20      Q.   Okay.  Go ahead.  What else did
21  she say about your work ethic?
22      A.   And the fact that my
23  professionalism, she had concerns about that.
24      Q.   You characterize that as work
25  ethic?  You're putting that all together?

Page 154

D. Anderson
1
2       A.   Yes.
3       Q.   You go on to say, before I got
4   hurt, there was no concern about my work, my
5   duties or my work ethic.
6            Do you still say that's
7   correct?
8       A.   I do.
9       Q.   And you say that's correct even
10  though I showed you earlier something that
11  came from Valerie Van Kirk which happened
12  before you went out on leave of any type which
13  pointed out certain issues with your role as
14  community home supervisor?
15           MR. ZAHNER: Objection to
16  form.
17  BY MR. TURCHI:
18      Q.   Do you remember that document?
19      A.   Could you repeat your question?
20      Q.   Do you remember the document we
21  talked about earlier, I showed you earlier
22  that came from --
23      A.   Is it okay if I look through --
24      Q.   Sure -- from Vicky Anderson, not
25  Valerie Van Kirk, that happened in September

Page 155

D. Anderson
1
2   of 2010, before you took any leave?  Do you
3   remember that document?
4            I'll find it for you if you
5   can't.  Give me those and I'll find it for
6   you.  This is Defendant's Exhibit No. 4.  Do
7   you remember that document?
8       A.   I remember you showing me this,
9   yes.
10      Q.   And that's the document that was
11  -- the supervisory contact that was given to
12  you by Vicky Anderson when she was your
13  supervisor back in September of 2010; correct?
14      A.   Yes.
15      Q.   And that's before you took any
16  medical leave; correct?
17      A.   Yes.
18      Q.   And there are issues -- it says,
19  reason for the contact, site issues; correct?
20      A.   Review site issue.
21      Q.   Yeah.  Review site issues is the
22  reason for the contact.  She had issues with
23  the site.  You were the acting CHS and she was
24  pointing out to you certain issues at the
25  site; correct?

Page 156

D. Anderson
1
2       A.   Yes.
3       Q.   So going back to your letter
4   that you gave to human resources July 27,
5   2011, you said, before I got hurt there was no
6   concern about my work, my work duties or my
7   work ethic.  That's not totally correct, is
8   it?
9       A.   Yes, it is.
10      Q.   All right.  So Vicky Anderson's
11  note to you back before you took any leave,
12  before you got hurt, you didn't take that to
13  be anything?
14      A.   Nope, no, sir.
15      Q.   Okay.  You can put that aside.
16      A.   Okay.
17      Q.   And, again, the only thing that
18  you're complaining about here, which you say
19  in the next to the last paragraph, is, I feel
20  I am being harassed and discriminated against
21  because of my health conditions, which I
22  received on the job; correct?  That's what you
23  were telling human resources was the basis of
24  your discrimination and harassment, your
25  health issues?

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 157

D. Anderson
1
2   A.   I think that's why she started
3   it.
4   Q.   Okay. I'm not asking you that.
5   That's what you told human resources?
6   A.   Then repeat your question.
7   Q.   All you told human resources
8   was, the basis of the harassment and
9   discrimination is your health issues?
10   A.   Yes, that's what I told HR.
11   Q.   Now, we established earlier you
12   had a meeting with people in HR after you
13   submitted this complaint; correct?
14   A.   Yes.
15   Q.   And you don't know one way or
16   the other what HR did to investigate it?
17   A.   I don't know.
18   MR. TURCHI: All right.
19   You can put that aside.
20   (Exhibit D-12 is marked for
21   identification.)
22   BY MR. TURCHI:
23   Q.   I'm showing you what we've
24   marked as Defendant's Exhibit No. 12. It's a
25   one-page letter. It's marked at the bottom

Page 158

D. Anderson
1
2   Defendant's 281 in our production. It's a
3   letter to you dated September 23rd of 2011
4   from Denise Lamlin in HR at KenCrest; correct?
5   A.   Yes.
6   Q.   Do you remember getting this
7   letter?
8   A.   Yes.
9   Q.   In the letter, among other
10   things, Denise is saying to you, I'm providing
11   this to confirm my verbal reply given response
12   to your letter addressed to me in 7/27/11.
13   She's referring to the
14   complaint that we just looked at; correct?
15   A.   Yes.
16   Q.   And she said, we met in person
17   on 8/9/11. Do you have a memory of that
18   meeting taking place, August 9th?
19   A.   We may have met. I'm not sure.
20   Q.   Well, didn't you say you do
21   remember having a meeting with HR after your
22   complaint?
23   A.   Yes, we did have a meeting.
24   Q.   You just don't remember when
25   that was?

Page 159

D. Anderson
1
2   A.   Right.
3   Q.   And I think we already
4   established that you were on leave at or about
5   the time that you gave the complaint, July
6   27th. That's right near the time you left for
7   leave; correct?
8   A.   I'm not sure.
9   MR. TURCHI: Okay. You can
10   put that aside.
11   (Exhibit D-13 is marked for
12   identification.)
13   BY MR. TURCHI:
14   Q.   This next document marked
15   Defendant's No. 13 is another letter dated
16   September 23, 2011 to you from Denise Lamlin.
17   Do you remember getting this letter?
18   A.   Yes.
19   Q.   And this letter talks about
20   another meeting that you had. Actually, the
21   letter says it was the same day of the letter,
22   September 23rd. Do you remember that meeting?
23   A.   Yes.
24   Q.   And that was before you were
25   getting ready to come back to work; right?

Page 160

D. Anderson
1
2   A.   Yes.
3   Q.   In the second paragraph of this
4   letter, Denise says to you, at your request
5   Dekeshia, a mentor will be assigned to work
6   with you.
7   Does that refresh your
8   recollection that you asked for the mentor?
9   A.   No.
10   Q.   That person is CHS community
11   home supervisor Michelle Howell.
12   Do you remember Michelle
13   Howell being your mentor?
14   A.   Yes, I remember her.
15   Q.   In the next paragraph, Denise
16   says to you, the daily functions of the house
17   and the relations between staff have
18   functioned smoothly over the past couple of
19   months.
20   Do you have any information
21   to refute that that was an accurate statement?
22   MR. ZAHNER: Objection to
23   form.
24   THE WITNESS: Yes, I heard
25   otherwise.