# Exhibit 3

C

Anderson v Kencrest Services

Dekeshia Anderson
December 3, 2013

Page 161

D. Anderson

1  
2  BY MR. TURCHI:
3      Q.   Who did you hear it from?
4      A.   Staff.
5      Q.   Who?
6      A.   Chandelere.
7      Q.   Spell that name, please.
8      A.   I don't know how to spell it.
9      Q.   Is that male or female?
10     A.   It's a female.
11     Q.   I'll give it a crack.  It's
12  C-H-A-N-D-E-L-I-E-R.  Do you know her last
13  name?
14     A.   No.
15     Q.   All right.  And she worked under
16  you as an RA?
17     A.   Yes.
18     Q.   And she told you what?
19     A.   She told me that the staff was
20  stealing.  In fact, in the meeting that --
21  Valerie confirmed that while I was out money
22  was missing, materials was missing, staff was
23  calling out.  So it was not running smoothly.
24     Q.   Anybody but Chandelere tell you
25  that?

Page 162

D. Anderson

1  
2      A.   Valerie told me that they were
3  stealing.
4      Q.   In this meeting September 23rd?
5      A.   No, she didn't tell me in the
6  meeting September 23rd.  She told me
7  afterwards.
8      Q.   She told you after you went back
9  to work?
10     A.   Yes.
11     Q.   And you don't remember
12  Chandelere's last name?
13     A.   I think it's Saint Fatton.  I
14  think it's Saint Fatton.
15     Q.   Okay.  Anything else about that
16  statement?  Anybody else tell you any
17  information that you say refutes that
18  statement that the house was running smoothly
19  when you were not there?
20     A.   No.
21     Q.   Again, when you were done this
22  now second leave -- was this FMLA leave or
23  workers' comp leave or don't you remember?
24     A.   They made me take my personal
25  time.  I think that's -- I had to take my

Page 163

D. Anderson

1  
2  personal time.  I think that was FMLA.
3      Q.   You were out for about two
4  months; correct?
5      A.   Yes.
6      Q.   And is it your recollection that
7  you were paid that whole time?
8      A.   I think I ran out of time, so
9  no.
10     Q.   But you were still allowed to be
11  out?
12     A.   Yes.
13     Q.   And, again, you don't know
14  whether KenCrest's policy at the time was when
15  you take FMLA you have to exhaust any paid
16  vacation or personal time you have concurrent
17  with the FMLA leave?  You just don't know?
18     A.   With the FMLA leave, I know you
19  have to use your time.  I know that.
20     Q.   And that's what you did this
21  time when you were out?
22     A.   Yes, when I was forced to take
23  FMLA leave.
24     Q.   Didn't you ask for FMLA leave?
25     A.   I went to workmen's comp doctor.

Page 164

D. Anderson

1  
2  And they told me if I need time off, I would
3  have to take the FMLA leave.  I didn't ask for
4  it.  They told me I had to do it.
5      Q.   Who told you that?  The workers'
6  comp doctor?
7      A.   No.  HR from KenCrest told me I
8  had to take that leave.
9      Q.   Was there determination made by
10  somebody, whether it be outside of KenCrest or
11  in KenCrest, that you were aware of that this
12  was not workers' comp eligible?
13     A.   I don't know.
14     Q.   You didn't receive any
15  information in that regard?
16     A.   I don't recall that.  I recall
17  that HR called and told me that I cannot go to
18  the workmen's comp doctor, I had to go to my
19  own doctor.  And if I need time off, I would
20  have to use my personal time and take FMLA
21  leave.
22     Q.   But you don't know what the
23  basis for that was?
24     A.   Right, I don't recall.
25     Q.   You didn't get any documents

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 165

1           D. Anderson
2   that --
3       A.   Not that I recall.
4           MR. TURCHI: Okay.  Put
5   that aside.
6           (Exhibit D-14 is marked for
7   identification.)
8   BY MR. TURCHI:
9       Q.   I'm showing you a document we've
10  marked Defendant's Exhibit 14.  This is a
11  memorandum from KenCrest, Valerie Van Kirk to
12  you, dated October 31, 2011; correct?
13      A.   Yes.
14      Q.   Does your signature appear on
15  the document?
16      A.   Yes.
17      Q.   Do you remember getting this
18  document at or around the time?
19      A.   Yes.
20      Q.   And, again, this is from Valerie
21  Van Kirk; right?
22      A.   Yes.
23      Q.   She says in this document, this
24  is a follow-up to our meeting of 9/23/11.  I
25  am pleased to tell you that you are doing

Page 166

1           D. Anderson
2   well.
3           Did you take this to be
4   harassment or discrimination?
5       A.   No.
6       Q.   In fact, in this document, what
7   Valerie was doing was pointing out most of the
8   good things that you were doing, and, in a
9   supervisory way, telling you that there was
10  some other things that could be done a little
11  better; correct?
12      A.   Yes.
13      Q.   Did you think this was
14  appropriate supervision on Valerie's part?
15      A.   Yes.
16           MR. TURCHI: You can put
17  that aside.
18           (Exhibit D-15 is marked for
19  identification.)
20  BY MR. TURCHI:
21      Q.   Let me ask you a question about
22  this prior document.  This was Defendant's 14,
23  the October 31st memo from Valerie Van Kirk to
24  you.  It is correct, is it not, that after you
25  got this document from Valerie, at any time

Page 167

1           D. Anderson
2   before you were demoted back to an RA, you
3   didn't take any medical leave, you didn't take
4   any FMLA leave, you didn't take any workers'
5   comp leave; correct?
6       A.   Right.
7       Q.   Now, look at the next document.
8   We've marked as Defendant's Exhibit No. 15 a
9   multiple-page document that we produced in
10  discovery marked as Defendant's 187, 188 and
11  189.  Now, there's no signature on this
12  document.  Do you remember getting it?
13      A.   I've never seen this before in
14  my life.
15      Q.   Okay.  Never before today?
16      A.   No.
17      Q.   In the first paragraph, what
18  Valerie purports to be saying is, I met with
19  you and your staff on 3/19/12 in regards to a
20  complaint that you were gossiping about her to
21  a coworker.
22           Do you remember that
23  meeting taking place?
24      A.   No.
25      Q.   Do you remember that allegation

Page 168

1           D. Anderson
2   being made by a staff against you?
3       A.   Yes.
4       Q.   Is it your recollection that
5   there was no meeting or you just don't
6   remember?
7       A.   I don't remember the meeting.
8       Q.   You stated you did not
9   speak with PW -- we're not mentioning names.
10  I guess she's just trying to keep
11  confidentiality here -- in reference to CSF.
12  Did you tell Valerie that?
13      A.   Yes.
14      Q.   PW confirmed that you and he
15  were not conversing about CSF, but you did say
16  aloud that you would have to write her up for
17  callouts.  Do you remember Valerie telling you
18  that?
19      A.   I remember this, yes.
20      Q.   And Valerie goes on to say, I'm
21  not saying that you purposely made the
22  statement aloud for him to hear, but I am
23  saying that this behavior should not be
24  repeated and is unacceptable.
25           Did you take that to be

Anderson v Kencrest Services

---

Page 169

D. Anderson

1
2   discrimination or harassment?
3       A.   Yes, I believe it's harassment.
4       Q.   Did you think it was appropriate
5   for your supervisor to point out to you that
6   you shouldn't be saying loud enough for other
7   staff to hear that you should be disciplining a
8   member of your staff?
9       A.   Can you ask me that again?
10      Q.   Yes.  When you were a
11  supervisor, when you gave discipline for
12  whatever reason to one of the people under
13  you, did you do that in private or did you do
14  that aloud for everybody --
15      A.   I did it in private all the
16  time.
17      Q.   So you accept that that's the
18  appropriate way to do it?
19      A.   Yes.
20      Q.   So isn't Valerie saying here,
21  whether you remember getting this document or
22  not, isn't she saying that there was this
23  incident where somebody complained about you,
24  she investigated it, she didn't believe that
25  you were actually doing what they complained

---

Page 171

D. Anderson

1
2   you and all she told you was, don't do that,
3   it's not appropriate, why do you think that
4   that was harassment or discrimination?
5       A.   I wouldn't think that is
6   harassment if that's all she told me.
7       Q.   Well, what else did she tell
8   you?
9       A.   She told me that she had proof
10  because PW said that I said --
11      Q.   Okay.  Anything else?
12      A.   -- that I was gossiping and
13  talking.  To me, that is harassment,
14  especially when it wasn't done by me.  She's
15  harassing me.
16      Q.   Did she give you any time off
17  for this?
18      A.   No.
19      Q.   Did she fire you for this?
20      A.   No.
21      Q.   Did she put a written warning in
22  your file for this?
23      A.   Yes.
24      Q.   There's a written warning in
25  your file for this?

---

Page 170

D. Anderson

1
2   about, which was gossiping, but she did learn
3   or believed she learned that you out loud
4   talked about disciplining one staff such that
5   another staff member heard it?  Do you
6   remember that occurring?
7       A.   You lost me again.
8       Q.   What are you not understanding?
9       A.   Are you asking me what Valerie
10  believed she learned?  Because I don't know
11  that.
12      Q.   That's right, you never would
13  believe it.  But did she discuss with you this
14  issue?  Did she discuss with you that she, in
15  investigating the complaint that you were
16  gossiping, learned that you out loud talked
17  about discipline of one staff such that
18  another staff heard it?  Did she discuss that
19  with you?
20      A.   Yes, she discussed it with me.
21      Q.   All right.  Again, I'm not
22  asking you to agree that it happened.  I'm
23  just -- you remember her discussing it?
24      A.   Yes.
25      Q.   So if she discussed that with

---

Page 172

D. Anderson

1
2       A.   She wrote me up for this.  I
3   don't know if it's written or -- she wrote me
4   up for this.
5       Q.   If she did, we'll get to it.  It
6   will be one of the other documents.
7            She goes on to point out
8   some other issues in here; right?  She's
9   talking about the green log books.  What are
10  the green log books?
11      A.   Those are daily communication of
12  what happened with the clients.
13      Q.   And she's also pointed out that
14  Chandelere -- I guess that's the same person
15  that you pointed out earlier -- made reference
16  to the fact that she does the majority of the
17  work when she works with you while you say
18  that you are doing paperwork in the office.
19  You disagreed with that complaint also.
20           However, through review of
21  the documentation within the site, it does
22  appear that she is doing the majority of the
23  work.
24           Do you think that the log
25  books did not show that at the time?

---

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 173

D. Anderson

1
2   A.   I don't agree with it.
3   Q.   Why?
4   A.   I don't think she -- I think the
5   work was shared.
6   Q.   What's the chart in the middle
7   of this page?
8   A.   I have no idea.
9   Q.   You don't know what that points
10  out?
11  A.   I don't.
12  Q.   It says green log entries,
13  January, February and March of 2012.
14  A.   Yeah, this is something Valerie
15  made up here.
16  Q.   Made up the chart or made up the
17  information?
18  A.   She made up the chart, along
19  with the information. We don't have a chart
20  like that for KenCrest.
21  Q.   That's not what I'm asking you.
22  You have green log books; correct?
23  A.   Yes.
24  Q.   So if somebody looks at green
25  log books and wants to see in January of 2012

Page 174

D. Anderson

1
2   log entries, somebody could do that and count
3   them; correct?
4   A.   Yes.
5   Q.   And who does DA refer to?
6   A.   Me.
7   Q.   And who does CSF refer to?
8        MR. ZAHNER: Objection.
9   BY MR. TURCHI:
10  Q.   If you know.
11  A.   Chandelere.
12  Q.   You said it was Chandelere Saint
13  something?
14  A.   Saint Fatton, right.
15  Q.   So that would be her initials;
16  right?
17  A.   Right.
18  Q.   So what this chart purports to
19  do -- and I'm not asking if you agree with it,
20  but it purports to point out log entries for
21  January, February and March relative to you
22  and Chandelere; correct?
23  A.   That's what it's pointing out,
24  yes.
25  Q.   All right. What are these? Do

Page 175

D. Anderson

1
2   you know what MV, MC and KS stand for?
3   A.   Do you want me to assume?
4   Because I don't know.
5   Q.   No, I don't want you to assume.
6   You never saw those before?
7   A.   The MV, I'm assuming that's the
8   client's initials.
9   Q.   Do you remember clients with
10  initials of those back at that time?
11  A.   Yes.
12  Q.   All right. So you don't have to
13  say their names. We really shouldn't say
14  their names. But what the chart purports --
15  and I know you didn't prepare it -- is that in
16  January and February and in March there were
17  more entries for Chandelere than there were
18  for you. That's all I'm asking you. Isn't
19  that what the chart indicates?
20  A.   That's what the chart indicates.
21  Q.   And you have no way, sitting
22  here today, of either agreeing with that or
23  pointing out that it's not true; correct?
24  A.   Right.
25  Q.   In the last paragraph of this

Page 176

D. Anderson

1
2   document it says, papers that were given to
3   you are not in the books, nor are they
4   properly filed. Old paperwork is still in the
5   books that should have been removed.
6        Did she speak to you about
7   that?
8   A.   No, not -- I don't know what --
9   Q.   She didn't or you don't
10  remember?
11  A.   I don't know when this was
12  dated, so I guess it doesn't matter.
13  Q.   Well, there's at the very top of
14  the -- again, you've already told me you
15  didn't see this document. I accept that. I'm
16  just asking you questions about the substance
17  of the document. At the top of it, it says
18  she met with you and your staff on March 19th
19  of 2012. So that's the time frame. And then
20  in the chart, it points out January and
21  February and March dates. Do you see those?
22  A.   Yes.
23  Q.   Of 2012; correct?
24  A.   2012, uh-huh.
25  Q.   So do you have any recollection

Anderson v Kencrest Services

Dekeshia Anderson
December 3, 2013

---

Page 177

1          D. Anderson
2   sitting here today of whether Valerie spoke
3   with you about this issue I read about papers
4   not being in the books, not properly filed,
5   and old paperwork in the books that should
6   have been discarded?
7       A.   Not at this time, no.
8       Q.   Did she talk to you about that
9   before?
10      A.   I think so, like, when she first
11  came on.  I think so.
12      Q.   You don't know for sure?
13      A.   I don't.
14      Q.   Go to the second page.  I want
15  to ask you some questions about those bullet
16  points there.
17          The second bullet point has
18  a date of March 10th of 2012.  She says you
19  were provided with the date of the next
20  speaking for ourselves meeting.  MC expressed
21  interest in attending a meeting to see if he
22  wanted to be part of the group.  I e-mailed
23  you the information and you were to ensure
24  that he made it to the meeting.  He missed the
25  meeting.

---

Page 178

1          D. Anderson
2          Do you remember that
3   occurring, MC missing the meeting?
4       A.   No.
5       Q.   You don't remember that being
6   brought to your attention?
7       A.   I don't know what Q site is.
8       Q.   I'm sorry?
9       A.   No, I don't remember.
10      Q.   She goes on to say, you actually
11  worked that day and you told her that you
12  forgot because you were busy.
13          Do you have a recollection
14  of that occurring?
15      A.   No.
16      Q.   The next one she says, on Friday
17  3/30/12 was MV birthday and there was no
18  indication by you that it was even his
19  birthday.  When I spoke to you about it, you
20  said you didn't remember his birthday.
21          Do you remember that
22  conversation with Valerie?
23      A.   No.
24      Q.   Was it the job of the community
25  home supervisor to acknowledge and recognize a

---

Page 179

1          D. Anderson
2   resident's birthday at the home?
3       A.   Absolutely.  That was done.
4       Q.   Okay.  And the last bullet point
5   on that page is talking about Thursday April
6   6th of 2012, she says she was at the site and
7   a staff was sent to see the doctor to complete
8   a follow-up appointment from the ER visit on
9   4/2/12.  And the staff who was a fill-in staff
10  had no idea why she was at the appointment.
11  She had no info from the ER.  And it appeared
12  that she was not aware prior to the shift that
13  she was expected to complete a med appointment
14  that morning.  The medical visit form that you
15  printed for the appointment did not list all
16  of KS's current meds causing the doctor to
17  prescribe a medication that the individual is
18  already taking.
19          Do you remember that issue
20  taking place?
21      A.   Yes.
22      Q.   Was it correct that you printed
23  out that form that didn't have all of the meds
24  on it?
25      A.   Yes.

---

Page 180

1          D. Anderson
2       Q.   And you sent that staff who was
3   a temporary staff to the appointment with that
4   form?
5       A.   I didn't send anyone.  I was
6   off.
7       Q.   Did you print out the form for
8   the appointment?
9       A.   I printed out the form, yes.
10      Q.   Do you accept and agree that, as
11  the CHS for the home, that you were required
12  to have the knowledge and make sure that the
13  forms were complete about medications that the
14  residents were taking?
15      A.   Yes.
16      Q.   So that was your fault?
17      A.   No.
18      Q.   Whose fault was it if it wasn't
19  yours?
20      A.   The forms are printed off the
21  database.  The nurses input the medication.
22  Not the CHS.
23      Q.   You don't have any obligation to
24  check that?  That's your position?
25      A.   No, that's not my position.

---

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

---

Page 181

1           D. Anderson
2     Q.   Did you check that form?
3     A.   Yes, I did.
4     Q.   Did you check that form as
5  against what the resident KS was actually
6  taking, his medication?
7     A.   I believe I did.
8     Q.   So did you miss something?
9     A.   I think so.
10    Q.   Then it was your fault?
11    A.   No.
12         MR. TURCHI: Okay.  You can
13  put that away.
14         (Exhibit D-16 is marked for
15  identification.)
16  BY MR. TURCHI:
17    Q.   This is Defendant's Exhibit No.
18  16.  It's an e-mail chain dated in March, the
19  end of March 2012, from -- the first one, from
20  Valerie to Lois Johnston and Denise Lamlin and
21  the re line is Dekeshia?
22    A.   You say the gray line is --
23    Q.   Re line, R-E, I'm sorry.  And,
24  again, you're not on this e-mail chain.  I'm
25  not going to ask you about the e-mail itself.

---

Page 182

1           D. Anderson
2  I want to see if you remember any of the
3  meetings that are referenced in here.
4          On the first page, Valerie
5  Van Kirk is telling the people in HR about a
6  meeting with you and Chandelere.  Do you see
7  that, very first line?
8     A.   Yes.
9     Q.   Do you remember having a meeting
10  with Valerie and Chandelere?
11    A.   Yes.
12    Q.   And in the meeting -- and I'm
13  now talking about the middle of the page where
14  it says meeting notes, 3/20/12.  Are you with
15  me?
16    A.   Yes.
17    Q.   Valerie says that Chandelere
18  reported that the CHS -- that's you; right?
19    A.   I'm not --
20    Q.   The meeting notes, are you with
21  me, Chandelere reported?
22    A.   Okay.
23    Q.   Chandelere reported that the
24  CHS -- that's you; right?
25    A.   Yes.

---

Page 183

1           D. Anderson
2     Q.   -- wrote her up for calling out
3  and CHS told another staff that she was
4  planning to write Chandelere up for calling
5  out.
6          Do you remember Chandelere
7  making that complaint?
8     A.   No.
9     Q.   She didn't talk about that at
10  the meeting?
11    A.   She didn't talk to me about it.
12    Q.   She didn't say that at the
13  meeting?
14    A.   Oh, at the meeting, yes.
15    Q.   All right.  At the meeting, you
16  were there, Chandelere was there, and Valerie
17  was there?
18    A.   Yes.
19    Q.   And part of the meeting was
20  Chandelere complained that you were writing
21  her up for calling out and told somebody else
22  about it?
23    A.   Right.
24    Q.   Whether that happened or not,
25  I'm not asking you.

---

Page 184

1           D. Anderson
2     A.   Okay.
3     Q.   But at the meeting it was
4  discussed?
5     A.   Yes.
6     Q.   Did Chandelere also say at that
7  meeting that you weren't helping with the
8  chores or care of the individuals?
9     A.   I don't think so.
10    Q.   Did Chandelere say at that
11  meeting she wants to transfer out of Henry
12  Avenue and does not want to work with Dekeshia
13  anymore?
14    A.   Yes.
15         MR. TURCHI: You can put
16  that aside.
17         (Exhibit D-17 is marked for
18  identification.)
19  BY MR. TURCHI:
20    Q.   Okay.  I'm showing you a
21  document marked as Defendant's Exhibit No. 17.
22  Is that only one page?
23    A.   Yes.
24         MR. TURCHI: Can we take
25  our break now and maybe get a couple copies of

---

Page 185

```
 1            D. Anderson
 2    our second page?
 3           MR. ZAHNER: Okay.
 4           (Break taken.)
 5    BY MR. TURCHI:
 6       Q.   Ms. Anderson, we've now
 7    corrected the problem with Defendant's
 8    Exhibit-17. It's now, as it should be, two
 9    pages. Down the bottom it's Bates stamped
10    Defendant's 182 and 183. Now, this is a
11    disciplinary action form given to you by
12    Valerie Van Kirk, your supervisor, on April
13    11th of 2012; correct?
14       A.   Yes.
15       Q.   And this one you refused to
16    sign; correct?
17       A.   Yes.
18       Q.   But you did get it?
19       A.   Yes.
20       Q.   It was discussed with you?
21       A.   Yes.
22       Q.   All right. You refused to sign
23    it because you disagreed with it; correct?
24       A.   Yes.
25       Q.   Now, based on your prior
```

Page 186

```
 1            D. Anderson
 2    testimony, am I correct that you didn't
 3    disagree that a complaint like this was made
 4    about you by a staff member, but your problem
 5    with it was that Valerie Van Kirk accepted the
 6    testimony or position of that staff member
 7    over yours?
 8       A.   What's the question?
 9       Q.   All right. Let me back up.
10    Part of the reason you were given this was
11    this issue that we discussed about you saying
12    loud enough that somebody else heard that you
13    were giving discipline to a staff member;
14    correct?
15       A.   Yes.
16       Q.   And you don't dispute that the
17    staff member involved made that complaint
18    about you. Your problem is that Valerie Van
19    Kirk accepted somebody's information about
20    that and not yours. Isn't that true?
21       A.   I don't dispute it you're
22    saying?
23       Q.   Back up, because I don't think
24    you understand me. You don't dispute, do you,
25    that somebody made a complaint that you were
```

Page 187

```
 1            D. Anderson
 2    overheard giving out discipline or talking
 3    about discipline to a staff member?
 4       A.   No.
 5       Q.   You don't dispute that that
 6    happened; right?
 7       A.   No.
 8       Q.   It did happen?
 9       A.   That's what I was told.
10       Q.   But do you have any information
11    that that didn't happen?
12       A.   I have -- no.
13       Q.   All right. So part of this
14    warning is Valerie saying to you that that
15    shouldn't happen, information regarding
16    sharing staff information with other staff,
17    that's one of the reasons why you refused to
18    sign this, right, because you don't believe
19    that happened?
20       A.   I refused to sign it because I
21    felt like I was being harassed by her.
22       Q.   You've said that many times, now
23    I'm asking you why. The first part of the
24    concern that she points out was that you were
25    overheard by a staff member giving or talking
```

Page 188

```
 1            D. Anderson
 2    about discipline to another staff member;
 3    correct?
 4       A.   Yes.
 5       Q.   You don't know whether that
 6    happened or not? You don't know whether
 7    somebody complained about it?
 8       A.   I don't know.
 9       Q.   You have no evidence to indicate
10    that it didn't happen, do you?
11       A.   I don't.
12       Q.   The second part of her concern
13    is a continued failure to ensure that all
14    documentation is completed, all books, data
15    books are not in order with missing
16    information.
17           Did you refute that as
18    well?
19       A.   I refute the whole written
20    warning, the whole thing.
21       Q.   Did she talk to you about both
22    of those issues?
23       A.   I don't think we discussed it.
24    I think she was trying to give me this
25    write-up. I wouldn't take it. I wouldn't
```

Page 189

D. Anderson

1   sign it. And she wouldn't discuss it because
2   I wouldn't sign it.
3       Q.   And is it correct that before
4   you were given this write-up, you told Valerie
5   that you wanted to transfer?
6       A.   Yes.
7       Q.   Where did you want to transfer
8   to?
9       A.   To the education department.
10      Q.   And that wasn't as a CHS;
11  correct?
12      A.   No.
13      Q.   All right. It was a job doing
14  what?
15      A.   Teaching.
16      Q.   Had you, at any time before you
17  told Valerie that you wanted to transfer,
18  applied for the job?
19      A.   For the -- yes.
20      Q.   The teaching job?
21      A.   Yes.
22      Q.   You applied for it?
23      A.   Yes.
24      Q.   How?

Page 190

D. Anderson

1       A.   I went on-line, and I wrote a
2   letter to the director -- I e-mailed her.
3       Q.   When was that?
4       A.   I believe it was in February.
5       Q.   Of 2011?
6       A.   Yes.
7       Q.   And I take it from your -- back
8   up.
9           So did you apply for that
10  position because you believed you were being
11  harassed as early as February?
12      A.   Yes.
13      Q.   And what form of harassment did
14  you receive as early as February?
15      A.   The same hostile environment.
16  It was just -- the constant pulling at the
17  staff, having them turn against me, the
18  constant underhanded meetings, having the
19  staff come to me with concerns, telling me to
20  direct it this way, but then turning around
21  saying you shouldn't do it that way. It was
22  just a constant backstabbing that went on.
23  And when I asked for paperwork and things that
24  I need for the site to return, she wasn't

Page 191

D. Anderson

1   giving it to me. But then she would turn
2   around and say, well, you need this, when I
3   already asked for it.
4       Q.   All right. And this was as
5   early as February, and in February we went
6   just that she gave you a good review; correct?
7       A.   Yes.
8       Q.   Do you have any information from
9   any source that Valerie Van Kirk did not
10  supervise her other homes the same way that
11  she supervised yours?
12      A.   No.
13      Q.   Do you have any knowledge of how
14  many people who worked for KenCrest in the
15  years 2010, 2011, 2012 took FMLA leave?
16      A.   No.
17      Q.   Do you have any information of
18  anybody in those years who worked for KenCrest
19  who took FMLA leave and was fired?
20      A.   No.
21      Q.   Do you have any information from
22  any source of how many people who worked for
23  KenCrest in 2010, '11 and '12 took workers'
24  compensation?

Page 192

D. Anderson

1       A.   No.
2       Q.   Do you have any information from
3   any source of whether anybody who worked for
4   KenCrest in '10, '11 and '12 who took workers'
5   compensation and were fired?
6       A.   No.
7           (Exhibit D-18 is marked for
8   identification.)
9   BY MR. TURCHI:
10      Q.   I'm showing you what we've
11  marked as Defendant's Exhibit-18. Now, this
12  is a letter, is it not, dated April 20, 2012,
13  to human resources from you; is that correct?
14      A.   Yes.
15      Q.   And this was given -- this is
16  another complaint that you made to human
17  resources; correct?
18      A.   Yes.
19      Q.   And you gave this complaint to
20  human resources shortly after the disciplinary
21  form that Valerie Van Kirk gave to you that
22  you refused to sign; correct?
23      A.   Yes.
24      Q.   All right. And between the July

Anderson v Kencrest Services

Dekeshia Anderson
December 3, 2013

---

Page 193

D. Anderson

1
2   27, 2011 complaint that you made to human
3   resources and the date of this, April 20,
4   2012, you made no other complaint to human
5   resources?
6       A.   No.
7       Q.   That is correct?
8       A.   That is correct.
9       Q.   Looking at the second paragraph
10  of your letter to human resources, you said, I
11  have not received any complaint from Valerie
12  Van Kirk about my job performance.  She told
13  me that I was doing very well and she put that
14  in writing for me.
15          Did I read that correctly?
16      A.   Yes, you read that correctly.
17      Q.   All right.  Well, tell me how
18  that statement that you made to human
19  resources could be true when all you've done
20  in your lawsuit and today is complain about
21  all these times that Valerie Van Kirk harassed
22  you about job issues.
23      A.   Can you repeat that?
24      Q.   Yeah.  That statement that you
25  made to human resources in this complaint was

---

Page 194

D. Anderson

1
2   not true; isn't that right?
3       A.   Is that your question?
4       Q.   Yes.  It was not true; correct?
5       A.   Wrong.
6       Q.   Okay.  Well, didn't you --
7   haven't you complained here today and
8   testified about multiple times that Valerie
9   Van Kirk told you there was an issue with
10  paperwork, there was an issue with this, there
11  was an issue with that?  Didn't that all
12  happen before April 20, 2012?
13      A.   Can I clarify?
14      Q.   Answer my question first and
15  then you can clarify.  Didn't you complain
16  about all those things here today?
17      A.   I did not complain.
18      Q.   Back up.  I've given you a
19  chance to testify today about all of these
20  supervisory contacts and other issues, the
21  memorandums, the letters that you received
22  from Valerie Van Kirk.  Have you not testified
23  about those?
24      A.   I did.
25      Q.   And in all of those forms,

---

Page 195

D. Anderson

1
2   didn't Valerie Van Kirk -- I know you don't
3   agree with her -- didn't she say that you
4   weren't doing your job properly, you weren't
5   filing paperwork, you weren't completing
6   chores with the other people consistently, you
7   were verbally abusing staff members, you at
8   one time had unprofessional communication when
9   a family member was around?  Remember all
10  those issues we discussed?
11      A.   Yes.
12      Q.   Well, all of those things
13  Valerie said to you or showed you in writing
14  before you wrote this letter to human
15  resources, didn't she?
16      A.   Yes.
17      Q.   Yet, you said in this letter to
18  HR, I have not received any complaint from
19  Valerie Van Kirk about my job performance.
20  That was not true, was it?
21      A.   No, it's not.  I don't think it
22  is.
23      Q.   You don't think -- you think it
24  is true or wasn't true?
25      A.   It wasn't true.  This is not

---

Page 196

D. Anderson

1
2   true.
3       Q.   You did point out, however, that
4   she told you you were doing well and she put
5   that in writing for me.  That's the document
6   that I showed you earlier; right?
7       A.   Yes.
8       Q.   And she did do that, she gave
9   you a document saying you were doing well, but
10  she also said in that document there are some
11  things you can do better; right?
12      A.   Yes.
13      Q.   The last thing you said here,
14  you want to transfer to a job you applied for
15  on February 20th.  Does that refresh your
16  recollection?  Is that when you applied for
17  this teacher job?
18      A.   Yes.
19      Q.   All right.  You can put that
20  aside.
21          (Exhibit D-19 is marked for
22  identification.)
23  BY MR. TURCHI:
24      Q.   I'm showing you what we've
25  marked as Defendant's Exhibit-19.  And this is

---

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 197

```
1              D. Anderson
2    a letter to you dated April 30, 2012 from
3    Maggie Bolin; correct?
4        A.   Yes.
5        Q.   Did you receive this letter?
6        A.   I think so.
7        Q.   All right.  Do you see that it
8    was sent certified mail up there?
9        A.   Oh, yeah, uh-huh.
10       Q.   Now, the first part of this
11   letter says that you and I, meaning Maggie and
12   you, met on Tuesday, April 24th to discuss
13   your grievance about the written warning you
14   received on April 11th for job performance
15   issues.  Did you have that meeting?
16       A.   Yes.
17       Q.   Do you remember that meeting?
18       A.   Yes.
19       Q.   Did you tell Maggie in that
20   meeting everything that you wanted to tell her
21   about that?
22       A.   I don't think so.
23       Q.   Why not?
24       A.   I was too emotional.
25       Q.   Okay.  Did Maggie give you the
```

Page 198

```
1              D. Anderson
2    opportunity to talk to her about what your
3    concerns were?
4        A.   I don't feel like she did.
5        Q.   Did you know who Maggie Bolin
6    was at that time?
7        A.   Yes.
8        Q.   Did you ever meet her before
9    that meeting?
10       A.   Yes.
11       Q.   Did you ever have any contact
12   with her?
13       A.   No.
14       Q.   Did Maggie ever do anything to
15   you that you thought was harassment or
16   discriminatory?
17       A.   No.
18       Q.   Mary Ann Maugle was also there
19   at the meeting; correct?
20       A.   It was another person.
21       Q.   You didn't know who it was?
22       A.   No.  She did introduce herself,
23   but I don't remember the name.
24       Q.   All right.  In the third
25   paragraph, she says, also, I wish to clarify
```

Page 199

```
1              D. Anderson
2    the part of our discussion pertaining to your
3    option for stepping down to an RA position.
4              Was that discussed with you
5    at that meeting?
6        A.   Yes.
7        Q.   Did you bring that up or did she
8    bring that up?
9        A.   They brought that up.
10       Q.   All right.  If a decision were
11   made in that regard, then you would have to
12   consider RA openings in houses other than
13   Henry Avenue.
14              You understood that; right?
15       A.   Yes.
16       Q.   You didn't want to work at Henry
17   Avenue anyway; right?
18       A.   Right.
19       Q.   At the present time, there may
20   be a position available in the northeast.
21              Did she talk to you about
22   that position?
23       A.   No.
24       Q.   If you wish to pursue this or
25   other RA openings, please notify your
```

Page 200

```
1              D. Anderson
2    supervisor in writing with a copy to me.
3              Did you do that?
4        A.   I don't remember.
5             MR. TURCHI: Okay.  You can
6    put that aside.
7             (Exhibit D-20 is marked for
8    identification.)
9    BY MR. TURCHI:
10       Q.   I'm showing you what we've
11   marked as Defendant's No. 20.  It was produced
12   in discovery as Defendant's 291.  And this is
13   a copy of an e-mail chain between you and
14   Denise Lamlin; is that correct?
15       A.   Yes.
16       Q.   And I always have difficulty
17   reading these, but I think you have to start
18   all the way at the bottom.  You say hi -- this
19   is Wednesday, May 2nd, 2:14 p.m.  Am I
20   right --
21       A.   Yes.
22       Q.   -- about the time and date?
23       A.   Yes.
24       Q.   Hi, Denise.  After we talked
25   today and you told me not to come to work
```

Page 201

D. Anderson

1
2 today, Deb called me and asked for all the
3 things I have that is KenCrest. I did tell
4 you that I am uncomfortable working at Henry
5 Avenue, but I'm not quitting. I'm just not
6 sure what is going on at this time. Can you
7 clear this up for me?
8          Do you remember that to
9 Denise?
10     A.   Yes.
11     Q.   And Denise responded to you;
12 right?
13     A.   Yes.
14     Q.   She responds, it looks like,
15 within 20 minutes; am I right? May 2nd 2012,
16 2:31 p.m.?
17     A.   Yes.
18     Q.   She says, hello Dekeshia. Yes,
19 thank you for contacting me.
20          She goes on to say, without
21 reading the whole thing so the court reporter
22 doesn't continue to get mad at me, all Deb
23 really wants is the stuff that she needs to
24 run the house.
25          Did you understand that as

Page 203

D. Anderson

1
2 BY MR. TURCHI:
3     Q.   Now, this is Defendant's Exhibit
4 No. 21. And this was also produced as
5 Defendant's 287. All you need to do is look
6 at the very top of this. This is an e-mail
7 chain from you back to Denise and Deborah
8 Rowell, is it not, dated May 2, 2012 at 4:48
9 p.m.?
10     A.   Yes.
11     Q.   And you say -- this is your
12 reply to Denise confirming that you got the
13 e-mail. You say, hello Denise. Thank you for
14 understanding and I will wait to hear from
15 you. Thank you, Dekeshia Anderson.
16     A.   This is confirming I got what
17 e-mail?
18     Q.   The e-mail that we talked about
19 earlier. It's also below -- it's also below
20 in this the middle part of this page, D-21,
21 where she's telling you that all you need to
22 bring back to Deb is the stuff to run the
23 house.
24     A.   Okay.
25     Q.   Is that correct now?

Page 202

D. Anderson

1
2 the CHS you were in possession of certain
3 things that the house needed?
4     A.   Yes.
5     Q.   Okay. So am I correct that
6 Denise cleared up your question that you asked
7 her in that e-mail?
8     A.   Yes.
9     Q.   All right. Now, the last part
10 of this chain is at the top. It says hello
11 Dekeshia. I replied to your e-mail. Would
12 you please respond and let me know that you
13 got my reply?
14          Did I read that correctly?
15     A.   Uh-huh, yes.
16     Q.   There is also a note on here
17 that I will let you know is from Denise's
18 handwriting. It says at 3:40 p.m. I called
19 Dekeshia and spoke to her re my e-mail
20 content, Denise Lamlin.
21          Do you remember having that
22 conversation?
23     A.   No.
24          (Exhibit D-21 is marked for
25 identification.)

Page 204

D. Anderson

1
2     A.   Okay. Yes.
3          (Exhibit D-22 is marked for
4 identification.)
5 BY MR. TURCHI:
6     Q.   This is a document marked as
7 Defendant's Exhibit No. 22. This is a letter
8 from Denise Lamlin to you dated May 7, 2012.
9 Do you remember receiving this letter?
10     A.   Yes, I believe so.
11     Q.   All right. She starts by saying
12 this is a response to your letter dated April
13 20, 2012. That was your complaint of
14 harassment/discrimination; correct?
15     A.   Yes.
16     Q.   And she also points out there
17 that there was a meeting about that on April
18 27th to discuss your allegations; correct?
19     A.   Yes.
20     Q.   Do you remember that meeting?
21     A.   I don't remember.
22     Q.   Do you know what, if anything,
23 HR at KenCrest did between the time of your
24 letter and the time that they met with you to
25 discuss your allegations in the way of



Page 205

1         D. Anderson
2 investigating your complaint?
3         MR. ZAHNER: Objection to
4 form.
5         THE WITNESS: No, I don't.
6 BY MR. TURCHI:
7     Q.   Denise says at the end of this
8 first paragraph that we met today, meaning May
9 7th, to discuss the outcome.  Do you remember
10 that meeting?
11     A.   No.
12     Q.   She points out in the second
13 paragraph that you told her and continue to
14 tell her that you feel harassed and you're
15 uncomfortable about your supervisor at Henry
16 Avenue.  Is that what she's saying in that
17 second paragraph?
18     A.   That's what she's saying, yes.
19     Q.   Is that correct, did you tell
20 Denise that?
21     A.   Yes.
22     Q.   And you told her again, she's
23 saying, at the end of that second paragraph,
24 that you didn't want to go back there and you
25 want to transfer out of Henry Avenue?

Page 206

1         D. Anderson
2     A.   That's not correct.
3     Q.   You did not tell her that?
4     A.   I don't think so.
5     Q.   Okay.  Now, we're talking about
6 a meeting that Denise's letter indicates
7 occurred on May 7th of 2012.  You weren't
8 telling her as of May 7th that you were
9 feeling harassed there and didn't want to go
10 back to work there?
11     A.   I told her I was feeling
12 harassed and I would like to be transferred.
13     Q.   All right.  So you never said to
14 her you didn't want to go back to work there?
15     A.   I don't think so.
16     Q.   Okay.  Go to the second page of
17 the exhibit, please.  In the third line of
18 that paragraph that starts at the top of the
19 page Denise says, during our phone
20 conversation, which she references above
21 taking place on May 2nd, you adamantly told me
22 that returning to your job at Henry Avenue is
23 not an option because you feel uncomfortable
24 there.
25         Did you have that

Page 207

1         D. Anderson
2 conversation with Denise Lamlin?
3     A.   No, sir.
4     Q.   Okay.  You never told her
5 anything like that?
6     A.   I don't recall that, no.
7     Q.   You don't recall it or you --
8     A.   I have not told her I would not
9 return to work.
10     Q.   And then she goes on to say, I
11 placed you on a paid administrative leave
12 pending the completion of my review.  Did that
13 happen?
14     A.   Yes, she did place me on
15 administrative leave.
16     Q.   She asked you at the end of this
17 letter to notify her in writing by May 10th if
18 you were interested in available jobs as an RA
19 in Philadelphia or eastern regional programs;
20 is that correct?
21     A.   Yes.
22     Q.   Did you do that?
23     A.   Yes.
24         (Exhibit D-23 is marked for
25 identification.)

Page 208

1         D. Anderson
2 BY MR. TURCHI:
3     Q.   Okay.  Defendant's Exhibit-23 is
4 another e-mail chain between you and Denise
5 Lamlin provided in discovery as Defendant's
6 236 and 237.  The e-mail chain starts on the
7 second page, actually, back on May 2nd.  And
8 then on the first page there are a couple of
9 e-mails dated May 23rd and May 24th.  Do you
10 see those?
11     A.   Uh-huh.
12     Q.   You have to speak up?
13     A.   Yes.  I'm sorry.  Yes.
14     Q.   Can you confirm that these were
15 e-mails that you sent and received to Denise
16 Lamlin and from Denise Lamlin?
17     A.   Yes.
18     Q.   Okay.  Just so the record is
19 clear, those are e-mails that you sent to
20 Denise and that she sent to you?
21     A.   Yes.
22     Q.   Correct?
23     A.   Yes.
24         (Exhibit D-24 is marked for
25 identification.)

Anderson v Kencrest Services

Dekeshia Anderson
December 3, 2013

Page 209

1          D. Anderson
2    BY MR. TURCHI:
3        Q.   Showing you Defendant's Exhibit
4    No. 24.  This is a two-page document produced
5    in discovery as Defendants 232 and 233.  It's
6    a letter dated May 24th from Denise Lamlin to
7    you.  Do you remember getting this letter?
8        A.   Yes.
9        Q.   Now, I want you to turn to the
10   second page, top of the page, the first
11   paragraph, she said that in an interview on
12   Tuesday, May 22nd, you told the interviewer
13   that you can only work on Saturday, Sunday,
14   and one weekday because you have another job.
15   Did you tell the interviewer that?
16       A.   Yes.
17       Q.   She says, in the next paragraph,
18   it was also reported to me that during the
19   5/22 interview, you made disparaging remarks
20   about the Philadelphia residential program,
21   such as saying that the supervisors don't help
22   when you asked them that the paperwork is too
23   much and you couldn't get it done, et cetera.
24            Did you tell the
25   interviewer that?

Page 210

1          D. Anderson
2        A.   No.
3        Q.   Did you respond to this letter
4    from Denise saying that that wasn't true?
5        A.   I'm not sure.
6        Q.   You can put that aside.
7            I'm sorry.  We need to go
8    back to that second page, the last paragraph.
9    Denise says to you, you must let me know
10   whether you are available for full-time or
11   part-time work and specifically what days and
12   times you are available.
13            Do you remember Denise
14   asking you that?
15       A.   I think so.
16       Q.   Do you think that if she was
17   looking to find a position for you, that was a
18   fair question for her to ask you?
19       A.   What's the question again?
20       Q.   We've established earlier that
21   Denise was working with you to try to find an
22   RA position that was acceptable to you;
23   correct?
24       A.   Correct.
25       Q.   Do you think that it was fair

Page 211

1          D. Anderson
2    for her to ask you that question considering
3    she was trying to place you in a position?
4    She would need to know whether you wanted full
5    or part-time work; right?
6        A.   Yes.
7        Q.   She would need to know what days
8    you were available to work; right?
9        A.   Yes.
10           (Exhibit D-25 is marked for
11   identification.)
12   BY MR. TURCHI:
13       Q.   Showing you Defendant's Exhibit
14   No. 25, marked in discovery as Defendant's 229
15   and 230.  It's a letter from Denise Lamlin,
16   June 1, 2012 to you; is that correct?
17       A.   Yes.
18       Q.   Do you remember getting this
19   letter?
20       A.   Yes.
21       Q.   In the fifth paragraph of the
22   first page, it says that you had asked Denise
23   about whether you would receive $11 an hour in
24   the RA position.  Do you remember asking that
25   question?

Page 212

1          D. Anderson
2        A.   Yes.
3        Q.   And Denise was confirming that
4    you would be paid that amount?
5        A.   Yes.
6        Q.   Did you understand at the time
7    that that was higher or lower or the same as
8    what other RAs were getting paid at the time?
9        A.   That was the same as I was
10   getting paid as an RA.
11       Q.   That's not what I'm asking you.
12   At the time that KenCrest was finding this
13   position for you, do you know whether RAs were
14   getting paid $11 an hour or something less?
15       A.   Less.
16       Q.   So KenCrest was agreeing to pay
17   you $11 an hour even though RAs were getting
18   paid less?
19       A.   Yes.
20       Q.   Go to the next page.
21       A.   I'm sorry.
22       Q.   Denise goes on to tell you there
23   that, at this point, the RA position at Erie
24   Avenue in Telford is available and will be
25   given to you if you wish to accept it.

Page 213

1          D. Anderson
2          Did you accept that job?
3     A.   Yes.
4     Q.   That's where you went to work
5  and stayed for the rest of your tenure at
6  KenCrest; correct?
7     A.   Yes.
8          (Exhibit D-26 is marked for
9  identification.)
10 BY MR. TURCHI:
11    Q.   I'm showing you what we've
12 marked as Defendant's No. 26, which also was
13 produced in discovery marked as Defendant's
14 No. 1. This is a supervisory contact sheet
15 that you received from the CHS who you were
16 working under at the Erie Avenue house when
17 you were working as an RA; correct?
18    A.   Yes.
19    Q.   And this was in November of
20 2012; correct?
21    A.   Yes.
22    Q.   Did you think that this was
23 harassment or discrimination?
24    A.   Yes.
25    Q.   Did you make any complaints

Page 214

1          D. Anderson
2  about that?
3     A.   No.
4     Q.   And this was not by Valerie Van
5  Kirk; correct?
6     A.   No, sir.
7     Q.   Who was this from?
8     A.   Her name was B -- I can't
9  pronounce her full name.
10    Q.   But your position is that she
11 also discriminated against you because of your
12 medical conditions?
13    A.   My position is that she was --
14 this was harassment, that's my position.
15    Q.   All right. Because of your
16 medical conditions?
17    A.   I don't know why she harassed
18 me.
19    Q.   Was there any other thing that
20 you think was possible to be harassed for when
21 you worked at KenCrest?  What else was she
22 harassing you for if it wasn't your medical
23 conditions?
24    A.   I don't know why she was
25 harassing me.

Page 215

1          D. Anderson
2     Q.   Okay.  Did you work under -- was
3  this a female?
4     A.   Yes.
5     Q.   Did you work under her all
6  during the time that you were an RA at Erie?
7     A.   Yes.
8     Q.   So that was from the end of May
9  or the beginning of June of 2012, all the way
10 through until March of 2013; correct?
11    A.   Yes.
12    Q.   Did you get any other forms of
13 discipline from her other than this contact?
14    A.   Yes.
15    Q.   You got more?
16    A.   Yes.
17    Q.   More forms?  Written warnings or
18 anything like that?
19    A.   Just the supervisory contacts.
20    Q.   You got more than one?
21    A.   Yes.
22    Q.   That's news to me.  I'll have to
23 look for them.
24         Okay.  But again, did she
25 ever say anything to you about medical

Page 216

1          D. Anderson
2  conditions or about leaves of absence or
3  workers' compensation or anything like that?
4     A.   No.
5     Q.   Did she make any discriminatory
6  remarks about you at all?
7     A.   No.
8          MR. TURCHI: All right.
9  You can put that aside.
10         (Exhibit D-27 is marked for
11 identification.)
12 BY MR. TURCHI:
13    Q.   I'm showing you a document
14 that's marked Defendant's Exhibit-27, produced
15 in discovery as Defendant's 65.  Did you ever
16 see this before?
17    A.   Yes.
18    Q.   Was this given to you by the
19 same supervisor you just complained about?
20    A.   Yes.
21    Q.   And this was in December of
22 2012, which is a month after the supervisory
23 contact; correct?
24    A.   Yes.
25    Q.   All right.  And she gave you a

Anderson v Kencrest Services

Dekeshia Anderson
December 3, 2013

Page 217

D. Anderson

1
2  verbal warning?
3      A.  Yes.
4      Q.  And she said you failed to
5  complete the double-check form for LS.  Is
6  that a resident?
7      A.  Yes.
8      Q.  This is your second-time error
9  on double-check medication administration
10 checklist?
11     A.  Yes.
12     Q.  The first one was 11/18.  That's
13 what was referred to in the supervisory
14 contact?
15     A.  I think so.
16     Q.  All right.  And I take it, from
17 what you've already testified to, that you
18 believe this was harassment and discrimination
19 as well?
20     A.  Yes.
21     Q.  Did you ever complain to anybody
22 about that?
23     A.  No.
24     Q.  I think we established, but I
25 just need to be clear, you didn't -- do you

Page 219

D. Anderson

1
2  one that you took at the end of 2012, was back
3  in July of 2011; right?
4      A.  Yes.
5      Q.  July to September of 2011?
6      A.  Yes.
7      Q.  Did you know any knowledge -- I
8  think the woman's name is Bozena Wesolowski.
9  Does that sound right to you?
10     A.  Yes.
11     Q.  She was your supervisor when you
12 were an RA at the end?
13     A.  Yes.
14     Q.  Do you know whether she even
15 knew you took medical leave?
16     A.  I believe she did.
17     Q.  How do you believe that?
18     A.  She talks to Valerie Van Kirk.
19     Q.  So you're assuming that Valerie
20 Van Kirk told her that you took medical leave?
21     A.  Yes, I'm assuming.
22     Q.  You have no information to
23 support it?  That's just your assumption?
24     A.  That's my assumption.
25         (Exhibit D-28 is marked for

Page 218

D. Anderson

1
2  remember, before you filed a lawsuit, you
3  filed a complaint with the EEOC or the
4  Pennsylvania Human Relations Commission?
5      A.  I'm sorry?
6      Q.  Do you know what the EEOC is?
7      A.  Equal --
8      Q.  Equal Employment Opportunity
9  Commission.
10     A.  Yes.
11     Q.  Do you remember filing a
12 complaint with them before you filed the
13 lawsuit?
14     A.  I think so, yes.
15     Q.  All right.  Do you remember that
16 the basis of your complaint was disability
17 discrimination?
18     A.  Yes.
19     Q.  And nothing else; right?
20     A.  I'm not sure.  I --
21     Q.  It wasn't race discrimination or
22 gender discrimination or age discrimination?
23     A.  No, none of that.
24     Q.  Okay.  And the last leave that
25 you took at KenCrest of any form, before the

Page 220

D. Anderson

1
2  identification.)
3  BY MR. TURCHI:
4      Q.  Showing you what we've marked as
5  Defendant's Exhibit-28 and marked in discovery
6  as Defendant's 62.  Is it correct that this is
7  a note that you wrote or typed to Stephanie
8  Righter?
9      A.  Yes.
10     Q.  And you said in this note that
11 it's a financial hardship for me to drive an
12 hour to work.
13     A.  Yes.
14     Q.  I would like to -- I think that
15 should say thank you for the opportunity to
16 work at one of your sites.  However, I will
17 not be able to return to work there.
18     A.  Yes.
19     Q.  So this was your resignation
20 letter?
21     A.  Yes.
22     Q.  It looks like there's a date on
23 there, effective 3/11/13.  Is that accurate as
24 far as you remember, March 11th of '13?
25     A.  I think so.  I'm not sure of the

Dekeshia Anderson
December 3, 2013

Anderson v Kencrest Services

Page 221

D. Anderson

1    exact date.
2        Q.   Were you out on workers'
3    compensation leave when --
4        A.   When I wrote this?
5        Q.   -- you gave that resignation?
6        A.   I think I was cleared then.
7        Q.   You were cleared to go back?
8        A.   Yes.
9        Q.   You were told to go back by the
10   doctor?
11       A.   Yes.
12       Q.   And you didn't go back, you
13   resigned?
14       A.   Yes.
15       Q.   Now, you didn't say anything in
16   your resignation letter to -- who is Stephanie
17   Righter, by the way?
18       A.   She was the PD of Erie Avenue.
19       Q.   And you didn't say anything to
20   Stephanie in your resignation letter that you
21   were leaving because you were harassed or
22   discriminated against?
23       A.   No, I did not.
24       Q.   The only thing you told her was

Page 222

D. Anderson

1    that it was a financial hardship for me to
2    drive an hour to work; correct?
3        A.   Yes.
4            (Exhibit D-29 is marked for
5    identification.)
6    BY MR. TURCHI:
7        Q.   I'm showing you what we marked
8    as Defendant's Exhibit No. 29.  It's a
9    multiple-page document produced in discovery
10   as 380 -- Defendant's 380 through 393.  Do you
11   recognize what this is?
12       A.   No.
13       Q.   It purports to be -- it says
14   supervisor satisfaction questionnaire.  Did
15   you ever see something like this when you
16   worked at KenCrest?
17       A.   I think so.  I think I have.
18       Q.   All right.  And am I correct
19   that the first two pages of this document you
20   filled out?
21       A.   Yes.
22       Q.   All right.  And does it refresh
23   your memory that this questionnaire was given
24   to you and staff members by Valerie Van Kirk

Page 223

D. Anderson

1    in a questionnaire form to get feedback from
2    them about how she was doing her job?
3        A.   Could you ask that again,
4    please?
5        Q.   Yeah.  Isn't it correct that
6    this questionnaire was provided to you and to
7    others at Henry Avenue by Valerie Van Kirk.
8    Do you remember that?
9        A.   No.
10       Q.   You don't remember it, all
11   right.  Why don't you read this and see if it
12   refreshes your memory.  Dear community home
13   supervisors, this questionnaire is to help me
14   better understand you, your position and how
15   you feel.  It goes on to say, how am I doing
16   as your supervisor?
17           Does that refresh your
18   memory that you filled out something that came
19   from Valerie Van Kirk which gave you an
20   opportunity to tell her how she was doing as
21   your supervisor?
22       A.   It doesn't, no.
23       Q.   How about reading -- are these
24   your comments?

Page 224

D. Anderson

1        A.   They are.  This is my
2    handwriting.
3        Q.   All right.  So, the first
4    question she asked you, do you feel as though
5    I am providing you the support and information
6    necessary to carry out your job expectations?
7    You said no.  If not, what can I do to better
8    assist you?  And then you gave her a list of
9    things that she could do; right?
10       A.   Uh-huh.
11       Q.   Yes?
12       A.   Yes.  I'm sorry.
13       Q.   So that doesn't refresh you that
14   Valerie gave you this questionnaire and asked
15   you these questions?
16       A.   It doesn't.
17       Q.   And you wouldn't know about the
18   remaining pages, which were to the staff?
19       A.   I heard about them.
20       Q.   You heard about them from staff
21   members?
22       A.   Right.  They was telling me how
23   she was taking statements from my staff, from
24   the staff about me.

Page 225

D. Anderson

1
2     Q.   About you?
3     A.   Yes.
4     Q.   Well, let's look at the third
5  page of this document.  Do you see where she's
6  saying to staff, how do you feel about the
7  support --
8     A.   Here?
9     Q.   You're on the right page.  How
10  do you feel about the support I provide as
11  your project director?  That's not asking
12  about you, is it?
13     A.   No.
14     Q.   It's asking about her; correct?
15     A.   Right.
16     Q.   So she's asking the staff both
17  about her and about you; correct?
18     A.   That's what it looks like.
19     Q.   Do you take this, what Valerie
20  did in handing out this questionnaire, to be a
21  form of harassment or discrimination against
22  you?
23     A.   Yes.
24     Q.   Okay.  Even though she was
25  asking questions about herself?

Page 226

D. Anderson

1
2     A.   Yep.  Yes, sir.  I'm sorry.
3     Q.   And even though she was asking
4  questions about her coworkers?
5     A.   Yes.
6     Q.   Now, do you have any information
7  sitting here today that Valerie Van Kirk did
8  not go through this same process with the
9  other homes that she supervised?
10          MR. ZAHNER:  Objection to
11  form.
12          THE WITNESS: No, sir.
13  BY MR. TURCHI:
14     Q.   You don't know one way or the
15  other; right?
16     A.   I don't know.
17          (Exhibit D-30 is marked for
18  identification.)
19  BY MR. TURCHI:
20     Q.   I'm showing you what we've
21  marked as Defendant's Exhibit-30, produced in
22  discovery as Defendant's 470.  This is an
23  e-mail chain.  And, again, you didn't get a
24  copy of this.  I'm going to ask you about some
25  of the content of it.

Page 227

D. Anderson

1
2          At the very bottom -- this
3  is Stephanie Righter writing to Lucille
4  Bernardo.  Do you know who Lucille Bernardo
5  was at the time?
6     A.   She was in HR.
7     Q.   Did you recognize her to be a
8  workers' comp administrator there at KenCrest?
9  Did you ever deal with Lucille Bernardo for
10  anything other than workers' comp?
11     A.   No, I don't think so.
12     Q.   So Stephanie is saying to
13  Lucille -- this is regarding you -- hi
14  everyone, Dekeshia was permitted to use three
15  days of PTO and four days of LTM to make up
16  the seven-day waiting period for WC, workers'
17  comp, while she was out on workers' comp and
18  that would be all.  She has been receiving
19  workers' comp.  However, that stopped this
20  Saturday.
21          Is that accurate, that your
22  worker's comp stopped around Saturday, March
23  2nd of 2013.  Do you remember that?
24     A.   I don't know.
25     Q.   At the top, Lucille Bernardo is

Page 228

D. Anderson

1
2  responding back to Stephanie Righter.  I asked
3  her to report, meaning you, to work on 3/12 --
4  Saturday 3/12, and she told me she could not
5  as she would be out of town.
6          Do you remember that
7  conversation?
8     A.   Yes.
9     Q.   So was that accurate?
10     A.   Yes.
11     Q.   She goes on to say, I told her
12  that workers' comp benefits would stop on that
13  day, as we had work for her and she chose not
14  to come back to work.
15          Did she tell you that?
16     A.   I think, yes.
17     Q.   Okay.  She said that she would
18  come back to work this coming Saturday.
19          Did you tell Lucille that?
20     A.   Yes, I think so.
21          MR. TURCHI: Okay.  You can
22  put that aside.
23          (Exhibit D-31 is marked for
24  identification.)
25  BY MR. TURCHI:

Page 229

1          D. Anderson
2      Q.   Ms. Anderson, I'm showing you
3   Defendant's Exhibit-31.  It's a one-page
4   letter produced in discovery as Defendant's
5   474.  It's a letter dated March 4, 2013 from
6   Lucille Bernardo, which says workers'
7   compensation specialist, to you; is that
8   correct?
9      A.   Yes.
10      Q.   Do you remember getting this
11   letter?
12      A.   Yes.
13      Q.   You can put that aside.  Just
14   give me a second.
15          I just want to go back to
16   one point, Ms. Anderson.  Do you remember back
17   in April of 2012 you made the complaint to
18   Denise Lamlin, to human resources?  Do you
19   remember that?
20      A.   Yes.
21      Q.   And I think the date of your
22   letter was April 27th or thereabouts.  Am I
23   correct that you called out sick for about
24   three days or so after that, before Denise
25   Lamlin contacted you and put you on paid

Page 230

1          D. Anderson
2   administrative leave?
3      A.   I'm not sure.
4      Q.   What was the reason for your
5   last leave at KenCrest?  That was a workers'
6   comp leave, correct, the very last one?
7      A.   We was in a car accident.
8      Q.   We being?
9      A.   Me, my clients, and the staff
10   workers.
11      Q.   Were you driving?
12      A.   Yes.
13      Q.   Was anybody else injured in that
14   accident?
15      A.   Yes.
16      Q.   How many other staff members
17   were in that accident?
18      A.   One other person.
19      Q.   And who was that?
20      A.   It was a male.  He was there a
21   short time, I don't -- I think Ishmael.  I
22   think Ishmael.
23      Q.   What was his position?  RA?
24      A.   RA.
25      Q.   Did he take workers' comp, as

Page 231

1          D. Anderson
2   far as you know, as a result of that accident?
3      A.   I'm not sure.
4      Q.   During the course of your
5   employment with KenCrest, from start to
6   finish, were you ever denied the ability to
7   take leave?
8      A.   No.
9          MR. TURCHI:  That completes
10   my questions.  Thanks very much.
11          THE WITNESS:  Thank you.
12          MR. ZAHNER:  I have some
13   follow-ups.
14          - - -
15          EXAMINATION
16          - - -
17   BY MR. ZAHNER:
18      Q.   Can you look at Exhibit-23?  And
19   then go to the second page.  At the top of
20   that page, there's a letter from -- an e-mail
21   from Denise Lamlin on May 2nd at 4:19 p.m.  Do
22   you see that?
23      A.   Yes.
24      Q.   And can you read the second
25   sentence of that letter?

Page 232

1          D. Anderson
2      A.   When we spoke today at noon I
3   felt it best that you not return to work until
4   I determine a resolution.
5      Q.   Whose decision was it for you to
6   not come back to work?
7      A.   Denise Lamlin.
8      Q.   And did you tell her you did not
9   want to come back to work?
10      A.   No.
11      Q.   And did you ever tell her that
12   you were -- that you wouldn't work at Henry
13   Avenue again?
14      A.   No.
15      Q.   And can you read the e-mail
16   below that from you on May 2, 2012 at the
17   bottom?
18      A.   Hi Denise --
19      Q.   Just read the -- start with the
20   second sentence.
21      A.   I did tell you that I'm
22   uncomfortable working at Henry Avenue, but I
23   am not quitting.
24      Q.   And this is something you had
25   told her previously; right?

Page 233

```
 1            D. Anderson
 2     A.   Yes.
 3     Q.   And then if you go to the first
 4  page of this, there's another e-mail from you
 5  on Wednesday, May 23rd, starting in the middle
 6  of the page.  And can you just read the last
 7  sentence in the first paragraph?
 8     A.   I actually told you I was ready
 9  to report to work for the next shift when you
10  put me on administrative leave based on your
11  concerns.
12     Q.   Is that statement true?
13     A.   Yes.
14     Q.   And then in the middle of the
15  second paragraph you mention that it seems
16  like you just terminated me and are treating
17  me like an outsider.  Why did you feel like
18  you were just terminated at that time?
19     A.   Because I had to go for
20  interviews for different sites.  And I wasn't
21  getting any, you know, job placements from
22  her.
23     Q.   And what was your understanding
24  after your conversations with her of the
25  reason for your administrative leave?
```

Page 234

```
 1            D. Anderson
 2     A.   My understanding was she was
 3  going to investigate the situation and get me
 4  back to work.
 5     Q.   And did you ever tell her you'd
 6  rather have an RA position rather than a CHS
 7  position?
 8     A.   No.
 9     Q.   Did you ever tell her that you'd
10  rather have a lower paying job?
11     A.   No.
12     Q.   Now, I know you were shown a
13  series of letters -- if you want to look to
14  refresh your recollection, at Exhibit-8,
15  Exhibit-9.
16     A.   Exhibit-8, Exhibit-9.
17     Q.   And Exhibit-12 and 13 are kind
18  of similar to that as well.
19     A.   12 and 13?
20     Q.   Yeah.  Just look at those real
21  quick.  Prior to your injury in December of
22  2010, did you ever receive any letters like
23  this?
24     A.   No.
25            MR. TURCHI: Object to
```

Page 235

```
 1            D. Anderson
 2  form.  Go ahead.  Go ahead.
 3            THE WITNESS: No.
 4  BY MR. ZAHNER:
 5     Q.   Okay.  And then you can put
 6  those aside.  And look at Exhibit-15.  It's
 7  the one with the chart on it.  I believe you
 8  said you didn't make this chart, did you?
 9     A.   No.
10     Q.   And you said the three, MV, MC
11  and KS were likely clients?
12     A.   Yes.
13     Q.   Did you only have three clients
14  at your location?
15     A.   At that time.
16     Q.   At that time you only had three
17  clients?
18     A.   Yes.
19     Q.   And also look at Exhibit-2.
20  Now, at the top of the first page, can you
21  just read what date this document was prepared
22  on?
23     A.   6/3/10.
24     Q.   And on the last page when you
25  signed it, what was the date you actually
```

Page 236

```
 1            D. Anderson
 2  signed off on this document?
 3     A.   3/26/12.
 4     Q.   You mentioned that after you
 5  sent them a letter, which is Exhibit-11, if
 6  you want to look, you sent a letter of a
 7  complaint of discrimination and harassment.
 8  And after that, you said there was a meeting
 9  with you and human resources.  Do you remember
10  that?
11     A.   Yes.
12     Q.   At that time, did you tell them
13  why you felt discriminated?
14     A.   Yes.
15     Q.   And why did you feel you were
16  discriminated?
17     A.   Because I went out on workmen's
18  comp, and I needed some medical assistance.
19     Q.   And when you were placed in your
20  new position where you said you had to drive,
21  I believe 45 -- after you were demoted and you
22  had to drive 45 minutes to work, did you
23  inform them that you would rather be somewhere
24  further away?
25     A.   No.
```

Page 237

1          D. Anderson
2     Q.   And can you go to Exhibit-29.
3    It's the one with the smiley face at the top.
4    Can you go to, I guess, the third place where
5    you stated that you wrote stuff in there.  At
6    the bottom of that, can you just read the last
7    sentence in -- for the question, do you
8    that --
9     A.   On page one?
10    Q.   Yeah, start on page one.  The
11   question is, do you feel that you have
12   challenges at your site, do you see that
13   question?
14    A.   This one?
15    Q.   Can you just read the last
16   sentence in that paragraph?
17    A.   And I do not feel I can come to
18   you about it.
19    Q.   And when you're saying you don't
20   feel you can come to you about it, who are you
21   talking about?
22    A.   Valerie Van Kirk.
23    Q.   And why did you feel like you
24   couldn't come to her about stuff?
25    A.   Because she would just -- she

Page 238

1          D. Anderson
2    was just like always putting me down, saying
3    things not happening, and I felt like she was
4    causing the problem.
5     Q.   And referring to Exhibit-29, as
6    well -- are you okay to continue?  I just have
7    a couple more questions.  I think just
8    probably one question.  Can you continue now?
9     A.   Yes.
10    Q.   I'm referring to document 29.
11   And prior to your injury in December of 2010,
12   did you ever see this document before that?
13    A.   No.
14    Q.   Just give me one minute, I think
15   that's it.
16          Can you just read to
17   yourself the second sentence, just to refresh
18   your recollection?  This one right here.  You
19   stated that I have not received any complaint
20   from Valerie Van Kirk.  Did you maybe mean
21   that you didn't receive any written
22   discipline?
23          MR. TURCHI: Object to
24   form.  You're leading the witness.  You can't
25   do that.  I'll object not only to form, but to

Page 239

1          D. Anderson
2    move for sanctions if you don't withdraw that
3    question.  That's a ridiculous question and
4    you know it.
5          MR. ZAHNER: You can answer
6    the question.
7          MR. TURCHI: You're going
8    to stick with that question that you just
9    asked her, did she maybe mean something else
10   than what she testified to?  Are you serious
11   about that?  If you are, then I think we're
12   going to have to call the Judge.  We'll do it
13   now.
14          MR. ZAHNER: I guess I can
15   reword the question.
16   BY MR. ZAHNER:
17    Q.   When you state I have not
18   received any complaint from Valerie Van Kirk,
19   what are you referring to when you say
20   complaint?
21    A.   From the time that she gave me
22   the review from the time -- from September
23   after I returned back, it wasn't like
24   complaints.  What was written up, from what
25   she was explaining to me, was things that she

Page 240

1          D. Anderson
2    would like done.  It wasn't a complaint.  It
3    was just her recommendation.  And, actually,
4    she told me it's what she expected.  It was
5    never a complaint about my work or what I was
6    doing.
7          MR. ZAHNER: Okay.  I think
8    that's it.
9          MR. TURCHI: Nothing
10   further.  Thanks.
11          - - -
12          (Deposition concluded.)
13          - - -
14
15
16
17
18
19
20
21
22
23
24
25

Anderson v Kencrest Services

Dekeshia Anderson
December 3, 2013

Page 241

```
 1              D. Anderson
 2           CERTIFICATE
 3  U.S. DISTRICT COURT     :
 4  EASTERN DISTRICT OF PA :
 5           I, Jackelyn Johnston, before whom
 6  the deposition of said witness was taken, do
 7  hereby certify that the witness, whose
 8  testimony appears in the foregoing deposition,
 9  was duly sworn, and that the transcribed
10  deposition of said witness is a true record of
11  the testimony given by the witness; that the
12  proceedings herein are recorded fully and
13  accurately; that I am neither attorney nor
14  counsel for, nor related to any of the parties
15  to the action in which this deposition was
16  taken; and, further, that I am not a relative
17  of any attorney or counsel employed by the
18  parties hereto, or financially interested in
19  this action.
20
21
22
23
24  ------------------------------------
25  JACKELYN A. JOHNSTON, Court Reporter
```